**RHJ MEDICAL CENTER, INC., Plaintiff,**

v.

**CITY OF DuBOIS, Defendant.**

**Civil Action No. 3:09–131.**

United States District Court, W.D. Pennsylvania.

Dec. 7, 2010.

Leonard J. Marsico, Alyssa Barillari, McGuire Woods, Pittsburgh, PA, for Plaintiff.

Thomas J. Elliott, Melissa M. Weber, Elliott Greenleaf & Siedzikowski, Blue Bell, PA, for Defendant.

### MEMORANDUM and ORDER OF COURT

GIBSON, District Judge.

This matter comes before the Court on the Defendant's Motion for Judgment on the Pleadings and Motion for a More Definite Statement (Document No. 25). Plaintiff filed a Brief in Opposition to Defendant's Motion for Judgment on the Pleadings and Motion for a More Definite Statement (Document No. 31). Defendant, without requesting leave of court, filed a Reply in Support of Its Motion for Judgment on the Pleadings and Motion for a More Definite Statement (Document No. 32). The Court **DENIES** Defendant's Motion for Judgment on the Pleadings and Motion for a More Definite Statement.

\* \* \*

"This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard." *New Directions Treatment Services v. City of Reading,* 490 F.3d 293, 296 (3rd Cir.2007) (Smith, J.). When an organization submits plans to open a methadone treatment facility, the story usually unfolds as follows. First, after filing the appropriate zoning paperwork, the organization begins preparation to open the facility. Second, after concerned community leaders learn of this proposal, fears of attracting drug addicts to their town generates massive opposition to the plan.[1] Third, invariably, a town meeting of some kind is held to allow representatives from the methadone clinic to address community concerns. Fourth, the discussions at the town hall meeting primarily focus on the dangers that a methadone clinic poses to the municipality. Fifth, through some zoning mechanism—whether an existing zoning ordinance, or a new one which is enacted for the instant situation—

---

1. See e.g., *Discovery House, Inc. v. Consolidated City of Indianapolis,* 319 F.3d 277, 278 (7th Cir.2003) ("Most people are in favor of programs that help drug addicts shake their addictions. But a lot of people also do not want drug treatment programs operating in their neighborhoods. These programs, some fear (whether the fear is rational or not is another question), will bring hoards of drug addicts, many of whom are embroiled in the criminal justice system, to "centers" that dispense one drug, methadone for instance, to the addicts who are trying to free themselves from the grip of another, more dangerous drug, like heroin.")

the community finds a reason why the methadone clinic should not be opened.

Although in most cases the die is cast following step two, invariably following step five, the organization is left without redress, and is effectively banned from opening a facility in the town. Tragically, the victims of exclusionary zoning tactics—recovering opiate addicts—tend to be those least prepared to fight against such tactics. Left with no other remedy, the organization files suit in court. The facts presented in this case fall neatly into this paradigm.

## FACTS

RHJ Medical Center, Inc. ("RHJ") is a Pennsylvania corporation in the business of operating methadone treatment facilities. (Compl. ¶¶ 15–16.) RHJ opened its first methadone treatment center in 2002 in Hunker, Pennsylvania. (Compl. ¶ 16.) RHJ has met the standards for federal certification and state licensure in outpatient treatment and methadone maintenance. (Compl. ¶¶ 9, 15.) In February 2006, RHJ began to search for a site on which to open a methadone treatment center in the City of DuBois. (Compl. ¶ 4.) The City of DuBois ("the City") is a Third Class City covering 3.1 square miles with a population of less than 10,000. (Compl. ¶ 20; Answer ¶ 92.) The City's population consists of 55% low to middle income persons. (Answer ¶ 92.) According to RHJ, the methadone treatment center located closest to the City is in the Borough of Clearfield, 20 miles away, and has a significant waiting list. (Compl. ¶ 24.) Plaintiff reports that as a result, many of the City's residents make a daily three-hour round trip to the methadone treatment center operated by RHJ in the Borough of Vandergrift. (Compl. ¶ 25.) The City asserts that there are private physicians and other healthcare professionals within the City to provide residents with methadone treatment. (Answer ¶ 24–25.)

RHJ chose a site at 994 Beaver Drive, DuBois, Pennsylvania, 15801 ("the site"), and signed a ten-year lease on March 31, 2006. (Compl. ¶¶ 4, 28.) The site was zoned in the "Transitional District" and was previously occupied by an insurance agency.[2] (Compl. ¶¶ 4, 26.) Adjacent to the rear of the site was a sidewalk known as Beaver Meadow Walkway ("the walkway"), which was dedicated as a public park on June 25, 1979.[3] (Compl. ¶ 27; Answer ¶ 27.) By law at the time, methadone treatment centers were forbidden to operate within 500 feet of a public park unless the municipal governing body voted to authorize such use following public notice and one or more public hearings. 53 P.S. § 10621 ("Section 621").

In late September or early October of 2006, RHJ's plans to open a methadone treatment center became public. (Compl. ¶ 30; Answer ¶ 30.) RHJ asserts that they were then subjected to a wave of

2. The nature of the occupancy permit for the site is a matter of dispute between the parties. RHJ asserts that the existing permit allowed use for a medical facility and that this was confirmed by an unidentified City inspector. (Compl. ¶ 26.) The City states that a change of use would not have been permissible under the permit and cites as evidence the fact that the site is now occupied by another insurance agency. (Answer ¶ 26.)

3. RHJ states that they did not know the sidewalk was part of the public park system.

(Compl. ¶ 27.) The City avers that RHJ knew or should have known that the sidewalk was a public park based on the fact that the City was using state and federal funds to maintain the sidewalk, which was in continuous use by the public. (Answer ¶ 27.) In its communications with RHJ, the City specifically cited a $51,000 grant from the Pennsylvania Department of Conservation and Natural Resources Community Conservation Partnerships Program in 2005. (Def.'s Ex. 2.)

negative press coverage, including a radio interview in which the mayor of DuBois stated that RHJ would likely not receive approval from the City to open such a facility and compared having a methadone treatment center in the City to "other cities dumping their garbage in DuBois." [4] (Compl. ¶ 31.)

At a work session on October 19, 2006, the DuBois City Council authorized the City Solicitor to draft a letter to RHJ "to advise them that if they still plan[ed] on opening their Center at 994 Beaver Drive, they need[ed] to follow all procedures, including Public Hearings and to remind them that they [we]re still too close to a recreational park (walkway)." [5] (Def.'s Ex. 1; Compl. ¶ 32; Answer ¶ 32.) A copy of this letter (Def.'s Ex. 2) was distributed at a City Council meeting on October 23, 2006, (Compl. ¶ 33) and also mailed to RHJ on that date (Answer ¶ 33). RHJ opened the methadone treatment center as planned two days later, on October 25, 2006. (Compl. ¶ 34.)

The City filed suit in the Clearfield County Court of Common Pleas on October 27, 2006, to enjoin RHJ from operating the methadone treatment facility at the site pursuant to Section 621. (Compl. ¶ 35; Answer ¶ 35.) The court granted the City a preliminary injunction with a continuance hearing scheduled for November 1, 2006. (Pl.'s Ex. 1.) The parties disagree as to whether or not the court heard oral argument from both sides before granting the injunction. RHJ says it did not (Compl. ¶ 35), while the City says that it did (Answer ¶ 35). The hearing was postponed to December 7, 2006. (Answer ¶ 35.) At that time, RHJ stipulated that the walkway was a public park within the meaning of Section 621 and that they had not obtained a certificate of use from the City before opening the clinic; and the court granted a permanent injunction until such time as the City approved RHJ's application following a public hearing and granted a certificate of use. (Def.'s Ex. 3; Compl. ¶ 35; Answer ¶ 35.)

In January of 2007, RHJ submitted to the City an application for a public hearing and a request for certificate of use.[6] (Compl. ¶ 36; Answer ¶ 36.) The City provided notice to surrounding property owners, and a public hearing was held on April 23, 2007. (Compl. ¶ 37; Answer ¶ 37.) At a public meeting on May 14, 2007, the City Council voted unanimously to deny RHJ's application and directed the City Solicitor to prepare a document of findings of fact and conclusions of law to support the decision. (Answer ¶ 38.) The Solicitor's document was unanimously adopted at the public City Council meeting on May 29, 2007 and was served on RHJ on June 1, 2007. (Answer ¶ 38; Def.'s Ex. 4, 5.) The finding of the City Council was that RHJ had not presented evidence sufficient to justify deviating from the restrictions of Section 621. (Def.'s Ex. 5 at 6.) The concerns of the Council included the methadone treatment center's lack of on-

---

**4.** The City denies that such an interview ever took place. (Answer ¶ 31.) Whether this interview took place would seem to be an important fact with respect to showing animus in the substantive due process analysis.

**5.** According to the City, this action was taken in response to an appearance by "agents and employees of RHJ" at the October 9, 2006, City Council meeting, at which they "refused to answer any questions concerning the proposed use of the facility." (Answer ¶ 32.)

RHJ does not mention any such meeting and asserts that the letter was drafted as a result of the negative press the center was receiving. (Compl. ¶ 32.)

**6.** RHJ asserts that they filed their application on January 9, 2007. (Compl. ¶ 36.) The City states that the application was first filed on January 11, 2007, but that RHJ failed to pay the necessary fee for a public hearing until January 29, 2007, at which time the application was deemed complete. (Answer ¶ 36.)

site security personnel, lack of means to transport patients to the regional medical facility if necessary, and insufficient parking for the expected number of patients and staff. (Def. Ex. 5 at 4–5.) The Council also noted that RHJ had not performed "any need assessment to determine whether its center was needed in the area and had no statistics concerning area drug use." (Def. Ex. 5 at 5.)

On June 15, 2007, the Third Circuit Court of Appeals ruled that § 621 violated the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq., and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701, et seq. *New Directions Treatment Services v. City of Reading*, 490 F.3d 293 (3d Cir.2007). RHJ moved to dissolve the Clearfield County Court of Common Pleas injunction in November 2007, based on *New Directions*. (Compl. ¶ 43.) The City opposed this motion. *Id.* The motion was granted and the injunction dissolved on March 6, 2008.[7] (Pl.'s Ex. 3.) According to RHJ, at that time, the City refused to reconsider the earlier decision to deny the methadone treatment center a certificate of use. (Compl. ¶ 44.) The City responded that RHJ did not make any further petition to the City for any permits. (Answer ¶ 44.)

Also following the Third Circuit decision in *New Directions*, at a November 21, 2007, work session, the City Council heard first reading of Ordinance Number 1720, which amended City zoning in a number of ways, including prohibiting "methadone or drug treatment clinics or centers" in the "Transitional District" and permitting medical facilities "with the exception of methadone treatment facilities and other drug treatment facilities of any kind" in the "Commercial–Highway Zoning District." (Pl.'s Ex. 4.) Ordinance Number 1720 also amended City zoning to expressly permit "drug treatment clinics or facilities including methadone treatment facilities or clinics" in the "O–1 Office District."[8] (Pl.'s Ex. 4.) The ordinance passed after a second reading at the City Council meeting on November 27, 2007.[9] (Pl.'s Ex. 4; Compl. ¶ 45; Answer ¶ 45.) In July 2008, RHJ terminated its lease on the site. (Compl. ¶ 44.)

Plaintiff filed a six-count complaint against Defendant. Count I asserts a violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses for Defendant's actions under 53 P.S. § 10621. Count II asserts a claim under the Rehabilitation Act for Defendant's actions under 53 P.S. § 10621. Count III asserts a claim under Title II of the ADA for Defendant's actions under 53 P.S. § 10621. Count IV asserts a violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses for Defendant's actions under its new zoning ordinance.

7. RHJ states that the City opposed its motion to dissolve the injunction. The City claims that it advised the court in that action that it did not oppose such a motion, but "only pointed out that a request to dissolve an injunction issued to prevent disobedience of a municipality's regulations is not a substitute for a land use appeal." (Answer ¶ 44.)

8. According to RHJ, there are no sites available in the "O–1 Office District" suitable for housing a methadone treatment center. (Compl. ¶ 45.) The City claims that there are such suitable sites and points out that the DuBois Regional Medical Center and many doctors offices are currently located in the "O–1 Office District." (Answer ¶ 45.) This seems to be a disputed issue of an important fact.

9. RHJ claims that the amendments were proposed in response to inquiries from RHJ as to filing an application for a Change of Use certificate to locate the methadone treatment center at an alternate site in the "Transitional District." (Compl. ¶ 45.) According to the City, no such conversations took place before or after the adoption of the ordinance. (Answer ¶ 45.)

Count V asserts a claim under the Rehabilitation Act for Defendant's actions under its new zoning ordinance. Count VI asserts a claim under Title II of the ADA for Defendant's actions under its new zoning ordinance.

Defendant makes six claims why judgment should be entered based on the pleadings. First, Plaintiff lacks standing. Second, Plaintiff is barred by res judicata from asserting Counts I–III. Third, Plaintiff is estopped from raising Counts I–III due to waiver. Fourth, Defendant is immune from actions taken in accordance with a court order. Fifth, the Court should not impose an equitable remedy—to do so would infringe on principles of federalism. Sixth, Plaintiff is barred by the statute of limitations. All six of Defendant's claims fail, and its motion is denied. Defendant's motion for a more definite statement is also denied.

## STANDARD OF REVIEW

Defendant filed a motion for judgment on the pleadings. FED.R.CIV.P. 12(c) ("After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.") In the past, a motion for judgment on the pleadings under FED. R.CIV.P. 12(c) was analyzed under the same standard as a 12(b)(6) motion, wherein the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Mele v. Fed. Reserve Bank,* 359 F.3d 251, 253 (3d Cir. 2004); *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989); *D.P. Enters., Inc. v. Bucks County Cmty. Coll.,* 725 F.2d 943 (3d Cir.1984).

That *was* the standard. No longer. There is a "new sheriff in town" now policing FED.R.CIV.P. 12(c), and his name is *"Twiqbal."* *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), or *Twiqbal as* they are commonly known, have caused a sea change in federal pleading standards.[10] In *Iqbal,* the Supreme Court "provide[d] the final nail-in-the-coffin for the 'no set of facts' standard"[11] derived from *Conley v. Gibson.*[12]

**10.** *See Moss v. U.S. Secret Service,* 572 F.3d 962, 972 (9th Cir.2009) (*Twombly's* plausibility standard was "a significant change, with broad-reaching implications"); *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 230 (3d Cir. 2008) ("Few issues in civil procedure jurisprudence are more significant than pleading standards, which are the key that opens access to courts."); *The Evolution Of A New Pleading Standard: Ashcroft v. Iqbal,* 88 ORE- GON. L. REV. 44 (2009) (*"Iqbal* thus represents a logical progression in the march toward greater judicial scrutiny at the outset of the litigation to avoid the inefficiencies and burdens that may be imposed on defendants later in the process."); Robert G. Bone, *Twombly, Pleading Rules, and the Regulation of Court Access,* 94 IOWA L. REV. 873, 875 (2009) ("Many judges and academic commentators read the decision as overturning fifty years of generous notice pleading practice, and critics attack it as a sharp departure from the 'liberal ethos' of the Federal Rules, favoring decisions 'on the merits, by jury trial, after full disclosure through discovery.' "); Edward D. Cavanagh, *Twombly, the Federal Rules of Civil Procedure and the Courts,* 82 ST. JOHN's L. REV. 877, 878–79 (2008) (arguing that *Twombly* changed the law "dramatically", "put[ting] an end to notice pleading as it has been understood in the seventy years since the enactment of the Federal Rules of Civil Procedure"); Robert L. Rothman, *Twombly and Iqbal: A License to Dismiss,* 35 No. 3 LITIGATION 1, 2 (2009) (arguing that *"Iqbal* drastically changed the landscape for Rule 12(b)(6) motions.").

**11.** *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3rd Cir.2009). *See also, Courie v. Alcoa Wheel & Forged Prods.,* 577 F.3d 625, 629 (6th Cir.2009) (the Supreme Court's decision in *Iqbal* "raised the bar for pleading requirements beyond the old 'no-set-of-facts' standard of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)").

Following *Iqbal,* conclusory or "bare-bones" complaints will not survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Under *Twombly* and *Iqbal,* in order to survive a motion to dismiss, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* quoting *Twombly* at 570, 127 S.Ct. 1955. In *Iqbal,* Justice Kennedy writing for the majority, concluded that a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* citing *Twombly* at 556, 127 S.Ct. 1955. "The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible." *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3rd Cir. 2009). Following *Iqbal,* the District Court must dismiss a complaint that pleads facts that are "merely consistent with" a defendant's liability, if the complaint "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* quoting *Twombly,* at 557, 127 S.Ct. 1955.

In *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3rd Cir.2009), the Third Circuit provided the test district courts should apply when considering a motion to dismiss under *Iqbal;*

Therefore, after *Iqbal,* when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Iqbal* at 1949. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips,* 515 F.3d at 234–35. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Iqbal,* 129 S.Ct. at 1949. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. Fowler,* at 210–211.

While the Third Circuit has not definitively resolved this issue, a number of district courts within the Third Circuit,[13] as well as other Courts of Appeals[14] have applied the *Iqbal* standard to motions filed under FED.R.CIV.P. 12(c). This Court is inclined to agree, though this decision will

**12.** *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (permitting district courts to dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

**13.** *See Gray Holdco, Inc. v. Cassady,* Civil No. 09–1519, 2010 WL 2640134, 2010 U.S. Dist. LEXIS 65055 (W.D. Pa. June 30, 2010), *Onco-*

*nome, Inc. v. Univ. of Pittsburgh,* Civil No. 09–1195, 2010 WL 1133425, 2010 U.S. Dist. LEXIS 27304 (W.D.Pa. Mar. 23, 2010), *Boretsky v. Corzine,* Civil No. 08–2265(GEB), 2010 WL 551275, 2010 U.S. Dist. LEXIS 13149 (D.N.J. Feb. 16, 2010).

**14.** *See Hayden v. Paterson,* 594 F.3d 150, 160–61 (2d Cir.2010), *Johnson v. Rowley,* 569 F.3d 40, 43–44 (2d Cir.2009), *Hole v. Tex. A & M Univ.,* 360 Fed.Appx. 571, 573 (5th Cir.2010).

have several consequences that may not have been discussed elsewhere. For decades, granting a motion for judgment on the pleadings was only appropriate where the movant "clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir.1988) (citing *Society Hill Civic Assoc. v. Harris*, 632 F.2d 1045, 1054 (3d Cir.1980)). Generally, federal courts were reluctant to grant a Rule 12(c) Motion for Judgment on the Pleadings, because it provides for summary disposition of a party's claim on the merits before discovery. *See Cardio–Med. Assoc. v. Crozer–Chester Med. Ctr.*, 536 F.Supp. 1065, 1072 (E.D.Pa. 1982); *Southmark Prime Plus, L.P. v. Falzone*, 776 F.Supp. 888, 891 (D.Del. 1991).

These prior standards mirrored the previous notice pleading standard articulated in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)—but *Iqbal* changed the game. No longer are cases dismissed only if "plaintiff can prove no set of facts in support of his claim," but rather a viable complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, quoting *Twombly* at 570, 127 S.Ct. 1955. *Iqbal* effected not only motions to dismiss, but has also impacted motions for judgments on the pleading, and imported the higher burden of "plausibility."

Applying the *Iqbal* standard will likely make it tougher for complaints to survive motions under FED.R.CIV.P. 12(c). Yet, to do otherwise would frustrate *Iqbal* In many cases, motions filed under FED. R.CIV.P. 12(c) and 12(b)(6) are complimentary and largely interchangeable—the key difference being that the right to file motions under FED.R.CIV.P. 12(b)(6) is waived if an answer is filed. A plaintiff should not be able to benefit from a weaker standard and higher probability of success under FED.R.CIV.P. 12(c) than he would under FED.R.CIV.P. (b)(6). The burden of proof on the Plaintiff should increase at each stage of litigation. If the Plaintiff bears the higher "plausibility" standard to challenge a motion to dismiss, a lower standard should not apply later if a motion for judgment on the pleadings is subsequently filed.

If different standards were to apply, defendants attempting to have cases dismissed may cease to rely on the less strict standard for FED.R.CIV.P. 12(c)—which would have a lower probability of success—and proceed to file motions for summary judgment. Motions for summary judgment are significantly more time consuming and cumbersome than motions for judgment on the pleadings. This additional litigation step would in turn serve to increase costs and frustrate judicial economy in cases which could have been resolved at the motion for judgment on the pleadings stage. Imposing the "plausibility" standard for FED.R.CIV.P. 12(c) helps to maintain the status quo—as much as possible following the changes posed by *Iqbal*—and avoid unnecessarily nudging cases towards summary judgment when a motion for judgment on the pleadings would suffice.

*Iqbal* has also impacted the manner in which courts must assess subject matter jurisdiction, even when considering a motion for judgment on the pleadings. Historically, when considering whether to dismiss a case for lack of subject matter jurisdiction under FED.R.CIV.P. 12(b)(1), the Court generally "must accept the allegations in the complaint as true and determine whether they are sufficient to invoke its jurisdiction." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009). *See also, McNutt v. Gen. Motors*

*Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *McNabb v. United States,* 54 Fed.Cl. 759, 763 (2002) ("If a defendant or the court challenges jurisdiction[,] . . . the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction."). Now, the Plaintiff "has the burden of establishing that subject matter jurisdiction exists within the parameters of the 'plausibility' standard established by *Twombly* and *Iqbal* when confronted with Defendant's 12(b)(1) motion to dismiss." *Sanchez v. United States,* 707 F.Supp.2d 216 (D.P.R.2010). If a Defendant challenges subject matter jurisdiction in a motion to dismiss or a motion for judgment on the pleadings, or if the court raises this issue *sua sponte,* FED.R.CIV.P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."), the Court should apply the standard recognized in *Sanchez.*

## ANALYSIS

### I. Standing

In order to obtain standing, Plaintiff must traverse a jurisdictional labyrinth that would make Daedalus envious. In this case, the Minotaur takes not the form of part-man and part-bull, but rather coalesces from an amalgam of complex jurisdictional questions—determining attenuated third party standing, finding whether an association is imminent under Article III, identifying whether prospective patients suffer from a qualified disability, and answering whether associational standing warrants equitable and compensatory relief. This chimeral conundrum is exacerbated by two decades of precedents that have not fully addressed the constitutional limitations on adjudication for associational standing. This memorandum will address how these issues have swirled together into a jurisprudential maelstrom, and perhaps, to some degree, calm the waters and provide some clarity in a confounding area of the law.

The labyrinth in this case winds as follows. First, in order to avail itself of the protections of the ADA and RA, Plaintiff must establish third party standing by showing an "association" with an individual with a disability. In this case, because no disabled persons were joined in the case or even identified in the complaint, Plaintiff can only receive standing based on a relationship or association with a patient.

Second, because Plaintiff was unable to open up the methadone clinic, it was unable to service any patients. Any patients could only be prospective. Nonetheless, our precedents have construed the ADA and RA as evincing Congress's intent to grant third party standing to entities that have a prospective association with disabled persons.

Third, Plaintiff—which never actually opened the methadone clinic due to the city's zoning decision—must show that the opening of the clinic and admittance of patients was "imminent." Associational standing notwithstanding, this court could not take cognizance of a fledgling clinic that has not taken enough steps towards establishing the requisite association, lest our jurisdiction traverse the boundaries of Article III. In this case, because Plaintiff took sufficient steps towards opening its doors for business, the opening of the clinic is considered imminent, and Article III standing is satisfied.

Fourth, even if the prospective patient suffers from a disability *per se,* Plaintiff must resolve a statutory Gordian knot and show that a curious "carve out" exemption—aimed at allowing employers to discharge employees with drug addictions—is inapplicable in the context of methadone clinics. Congress provided for an exemption for patients, separate from employees,

engaging in drug treatment programs—even if those individuals have a current drug addiction.

Fifth, even if the requisite association is established, and the opening of the clinic is imminent, Plaintiff must prove that the prospective patients—none of whom have been ascertained—would be protected by the ADA or RA. Merely having an impairment, such as an opioid addiction is inadequate; rather, the disability must substantially impact a major life activity. The Supreme Court's precedents dictate that inquiries into a person's disabilities must be an individualized *present* examination. This would seem to render generalized *prospective* examinations—the approach several other courts have undertaken—a Sisyphean task. Yet in this case, the Court finds that a serious opioid addiction that warrants admission to a methadone clinic, with the attendant daily disruptions of life activities in order to obtain the treatment, could satisfy this test. This finding would obviate the need for an individualized, fact intensive inquiry.

Sixth, if Plaintiff shows an "association" with an individual with a disability who is protected by the ADA and RA, exemptions notwithstanding, Plaintiff must show that it, RHJ—and not any associated disabled patients—was injured in violation of the ADA and RA. How can an entity be discriminated against by a statute aimed at protecting individuals with disabilities? This counterintuitive standard seems to be in tension with the text of the statute, but comports with subsequent guidance from the DOJ and relevant precedents from some—but not all—Circuits. If Plaintiff shows that it was discriminated against, standing is established in order to bring suit.

Seventh, even if the Plaintiff shows it was injured in violation of the ADA and RA, and can bring suit, the question remains whether standing exists for equitable relief as well for compensatory damages. Associational standing exists to grant third parties the right to sue on behalf of others. The benefit of such litigation should inure to the benefit of those aggrieved. Generally speaking, the third party is not the aggrieved party. Rather, the third party is suing on behalf of wronged individuals. Thus, equitable relief—ordering a city to issue a zoning permit, for example—would seem to be an appropriate remedy. In contrast, compensatory damages—lost profits, for example—would not directly benefit wronged disabled persons. For claims of damages, the Court considers whether the third party *itself*—and not aggrieved individuals—was injured. In such situations, compensatory damages would be appropriate because the benefit would inure to the injured party—the entity—regardless whether any individuals are actually injured.

\* \* \*

■ The Court finds that the Plaintiff meets all of these requirements, and after a journey worthy of Theseus through the heart of the labyrinth, the Minotaur is slain, and the Plaintiff remains in federal court, with standing to proceed on all of its claims.

### a. ADA and RA Grant Third Party Standing

The Court starts from first principles. The objects to which "the judicial authority of the union ought to extend to" are enumerated in Article III of our Constitution. Federalist No. 80 (Hamilton). The bounds of the judicial power are limited to Article III's "cases" and "controversies." *Lujan*, at 560, 112 S.Ct. 2130. The "cases" and "controversies" requirements "serve to identify those disputes which are appropriately resolved through the judicial process," *Lujan*, at 560, 112 S.Ct. 2130 citing

*Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). While some of the elements of standing "express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan,* at 560, 112 S.Ct. 2130 citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

Generally, a "plaintiff ... must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citations omitted). However, "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules." *Id.* at 501, 95 S.Ct. 2197. In certain cases, standing may exist because of statutorily created rights: "[T]he standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth,* at 500, 95 S.Ct. 2197. Where Congress grants a right of action to an entity or association, the entity may assert standing either in its own right or on behalf of its members. *Warth,* at 511, 95 S.Ct. 2197.

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

The ADA and RA are statutes in which Congress has granted third party standing. The regulation implementing Title II of the ADA provides, "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to *have a relationship or association.*" 28 C.F.R. § 35.130(g) (emphasis added). This provision establishes the basis for associational standing. The "prudential limits imposed in pure associational standing cases do not apply to" statutory grants of associational standing. *Addiction Specialists,* 411 F.3d 399, 407 (3rd Cir.2005). This broad conception of standing does indeed "extend standing to the full limits of Article III." *Id.* So "long as this requirement [of Article III] is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and indeed, may invoke the general public interest in support of their claim." *Warth,* 422 U.S. at 501, 95 S.Ct. 2197.

In *Addiction Specialists,* the plaintiff was denied a permit to open a methadone clinic, and sought a declaration that the city's denial of the permit violated the ADA and RA. *Addiction Specialists, Inc. v. The Township of Hamilton, Et Al.,* 1:04-CV-696 (W.D.P.A. Sept. 8, 2004). Relying on 28 C.F.R. § 35.130(g)—which provides "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a *relationship or association* "—the Third Circuit held that a methadone clinic could bring suit on its own behalf. *Addiction Specialists,* 411 F.3d 399 (3rd Cir.2005). The Court expressly rejected the Seventh Circuit's holding to the contrary in *Discovery*

*House,* which held a methadone clinic could not sue for damages on its own behalf under the ADA and RA. *Id.* citing *Discovery House,* 319 F.3d at 280 (7th Cir.2003).

The Third Circuit found that the Seventh Circuit test "ignores that the protections of the ADA and RA have been extended to shield entities *themselves* from discrimination." *Addiction Specialists,* at 407 (emphasis added). The court noted that "[a]lthough ASI ["Addiction Specialists"] is protected by these statutes only by virtue of its association with disabled individuals, ASI's standing to sue arises from *its own* alleged injuries, not those of its clients." *Addiction Specialists,* at 407 (emphasis added). The broad remedial purposes underlying the ADA and the RA do not limit relief to "qualified individuals with disabilities." *Addiction Specialists,* at 405 (citing *MX Group, Inc. v. City of Covington,* 293 F.3d 326, 334–35 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 47 (2nd Cir.1997)). Rather, the protections of the ADA are not limited to actual persons, as "any person," has been interpreted to include "individuals as well as entities." *Addiction Specialists,* at 406. The Third Circuit "has conclusively settled that the proprietors of a proposed methadone clinic have standing to seek relief both on their own behalf and on behalf of their clients under the ADA and Rehabilitation Act." *New Directions,* at 300 citing (*Addiction Specialists,* 411 F.3d 399, 405–408 (3rd Cir.2005)).

The Third Circuit noted that the *Discovery House* court "assumes that an entity bringing suit under the ADA and RA must necessarily assert the rights of its members rather than bringing suit 'in its own

right.'" *Addiction Specialists,* at 407 citing (*Discovery House,* 319 F.3d at 280 (7th Cir.2003)). This rule is premised on the questionable assumption that a methadone clinic "has a claim to standing under the ADA and RA only because it runs a business which *provides services*—like dispersing methadone—to persons presumably covered by those Acts." *Discovery House,* at 280 (emphasis added). The Seventh Circuit postulated that if the plaintiff "were running a plumbing business, it could hardly claim relief under either statute." *Discovery House,* at 281.

This "provide services" rationale seems to conflict with the guidance given in the Department of Justice's Technical Assistance Manual, the creation of which was mandated by an act of Congress. When drafting the ADA, Congress delegated to the Attorney General the responsibility to "render technical assistance to individuals and institutions" affected by the ADA in order to provide guidance to this, and other regulations in the ADA. 42 U.S.C. § 12206(c)(1). Under this authority, the Department of Justice issued the Title II Technical Assistance Manual, which aimed to "assist individuals and entities in understanding their rights and duties under the Act." The Americans with Disabilities Act, Title II Technical Assistance Manual, http://www.ada.gov/taman2.html.

Section II–3.9000, titled "Discrimination on the basis of association," provides an interpretation of 28 C.F.R. § 35.130(g) [15]— the provision the courts interpreted in *Addiction Specialists* and *Discovery House:* "In addition to familial relationships, the prohibition covers any type of association between the individual or entity that is discriminated against and the individual or

---

**15.** 28 C.F.R. § 35.130(g) ("A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association").

individuals with disabilities, if the discrimination is *actually based on the disability.*" *Id.* As long as the discrimination is based on a disability, any type of association suffices to grant third party standing. Illustration 2 in the Manual illustrates this concept: "[a] local government could not refuse to allow a theater company to use a school auditorium on the grounds that the company has recently performed at an HIV hospice." *Id.* As the Sixth Circuit remarked, "the theater company would have a right of action because of the wrong done to it." *MX,* at 335. Simply put, as long as the theater company had an "association" with disabled HIV hospice patients, even though none of the patients were injured or discriminated against, the theater company was wronged, and had standing to sue.

Contrary to the assertions of the *Discovery House* court, the entity need not "provide services" to disabled persons in order to obtain standing. A plumbing business, like a theater company, would be able to receive protection under the ADA. Accordingly, the Third Circuit rejected the standard from the Seventh Circuit which held that a methadone clinic has standing "only because it *provides services . . .* to persons covered by those Acts." *Addiction Specialists,* at 407 citing *Discovery House* at 281 (emphasis added). If a plumbing business performed sewage work for a home of disabled persons, and a local government decided not to hire that plumbing business because of its association with disabled persons, under the Third Circuit and Technical Assistance Manual's understanding of the law, the plumbing business would have been injured by loss of profits, and have standing under the ADA. Through the ADA and RA, Congress has allowed an entity, such as a methadone

clinic, to assert standing on behalf of a disabled third party.

### b. An "Association" with a Prospective Patient Generates Third Party Standing

A methadone clinic has third party standing if it has an association with disabled patients. The plain text of the statute permits entities to bring suit on behalf of disabled individuals with whom they have an "association." 28 C.F.R. § 35.130(g). This much is clear. What is unclear, however, is whether a methadone clinic that never opened—and thus never treated any actual patients—can claim standing based on a prospective association. The definition of "association," and whether the association can be prospective, presents several wrinkles.

In this case Plaintiff did not join any patients in the suit, and did not name any patients—current or prospective—in the complaint.[16] Plaintiff provided no details as to who would frequent the clinic beyond conclusory allegations that they intended to "provide comprehensive, medically supervised and licensed outpatient methadone treatment directed at rehabilitating persons living in DuBois and its surrounding community who require the treatment to alleviate their opiate dependency." Elsewhere Plaintiff noted that "RHJ targets clients with a primary dependence on opiates."

Defendant asserts that Plaintiff has not demonstrated the requisite "relationship or association" with any disabled individuals under the ADA or RA. Defendant notes that Plaintiff has not named a single patient in the caption of the complaint and only refers to "prospective patients," Plaintiff counters that it has standing to

---

**16.** In a footnote in its reply brief, Plaintiff remarked that prior to the issuance of the temporary injunction, it had "approximately

ten clients." However, this clientele was not mentioned in the Complaint, and is not considered in this opinion. (Pl.'s Repl. p. 7 n. 3.)

assert a claim under the ADA or the RA even if the entity's relationship with the disabled individual is "purely prospective."

*Addiction Specialists* presented a fact pattern similar to the instant case. *Addiction Specialists v. Township of Hampton,* 411 F.3d 399 (3rd Cir.2005). ASI ("Addiction Specialists Incorporated") sought to open a methadone treatment facility in the Township of Hampton, Pennsylvania ("Township"). *Id.* at 403. ASI entered into a lease for a property in Hampton and submitted a "Change of Use Application" with the Township. While the proposed location of the clinic was zoned as "highway commercial district"—which permitted drug stores, hospitals, medical offices and clinics—at the time Pennsylvania law treated methadone clinics differently from other medical facilities. *Id.* at 403. The Municipalities Planning Code ("MPC") prohibited the establishment of methadone clinics—but not other types of medical clinics—"within 500 feet of an existing school, public playground, public park, residential housing area, child-care facility, church, meetinghouse or other actual place of regularly stated religious worship...." *Id.* citing MPC § 621 (codified at 53 P.S. § 10621) [" § 621"].

At first, the Township granted ASI's permit. *Id.* However, one week later, the Township informed ASI that there was a "problem" involving their proposed facility. *Id.* After a hearing—where a number of Township officials and residents expressed their opposition to the establishment of a methadone treatment facility in Hampton—the Township found that the subject property was within 500 feet of a school and a public park and therefore rescinded its approval of ASI's permit. *Id.* The Township found that a travel agency located next door to the subject property—which offered on-site training to students enrolled in a travel and tourism class at the Community College of Allegheny County—qualified as a "school" within the meaning of § 621. *Id.* The Township also determined that the "Depreciation Lands Museum" was a "public park" within the meaning of § 621. *Id.*

ASI filed an appeal from the Township's zoning decision with the Court of Common Pleas of Allegheny County, alleging that "the Township acted arbitrarily and capriciously and abused its discretion by determining that the travel agency qualified as a school and that the museum qualified as a public park" *Id.* at 405. Additionally, ASI alleged that the denial of access to health services that ASI would provide to disabled individuals constituted unlawful discrimination under the "Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 952, *et seq.*; the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701, et seq." *Id.* at 405. While the land use appeal was pending in state court, ASI filed a federal complaint in the Western District of Pennsylvania, alleging violations of the United States Constitution, the Pennsylvania Constitution, the ADA, and RA.

Even though standing was not addressed in their initial briefs to the Court, on appeal the Third Circuit noted that it was "required to raise issues of standing *sua sponte* if such issues exist." *Addiction Specialists,* at 405. The parties did not dispute "that the broad language of the ADA and RA evidences a Congressional intent to confer standing on entities like ASI to bring discrimination claims based on their association with disabled individuals." Mat 405. Despite the fact that no patients were joined in the suit, the Third Circuit held that the clinic had standing to bring the claim.

In *MX Group v. City of Covington,* a case favorably cited by the Third Circuit in *Addiction Specialists,* MX Group attempt-

ed to open a methadone clinic in Covington, Kentucky. 293 F.3d 326, 328–29 (2002). Initially, the City awarded MX Group a zoning permit, but after "town residents expressed their displeasure regarding the proposed clinic at a City Commission meeting," the city held a hearing regarding the application. *Id.* at 329. Emotions at the meeting ranged "from 'proper decorum' to anger." *Id.* at 329.

After a tenant in the building where the clinic was to be located filed an appeal, the Covington Board of Adjustments held a hearing. *Id.* at 329. Witnesses testified that there was no need for a methadone clinic in Covington, for-profit methadone clinics "spawn criminal activity," methadone clinics spur "drug use and/or trafficking and drug trade, violence, shootings and death," and witnesses expressed concern "about the safety of the neighborhood children." *Id.* at 329. The Board of Adjustments subsequently revoked the zoning permit. *Id.* at 330. When MX Group attempted to locate the clinic at another site, the City informed the plaintiff that a methadone clinic "was not a permitted use in any zone in the city." *Id.* at 330. The City amended the zoning code, which "completely foreclosed Plaintiff's opportunity to locate in the city," *Id.* at 330–31.

The facts in *Addiction Specialists* and *MX Group* are quite similar to each other, and similar to the facts in the instant case. In both cases, a methadone clinic signed a lease, and submitted all of the appropriate paperwork to open a facility. Following a series of local zoning decisions, the town decided to deny the clinic the requisite permit. Relying on 28 C.F.R. § 35.130(g), both courts found that the clinic had an "association" with disabled patients, and

thus had "standing to seek damages on its own behalf." *Addiction Specialists,* at 408; *MX Group,* at 335. In both cases no patients were joined in the suit, and none were identified in the complaint.[17]

Yet, in neither of these opinions did the Circuit Court specifically address the issue central to the instant case—all of the patients with whom the methadone clinic associated were prospective. However, even though not specifically addressed, it is clear that because standing is a jurisdictional matter, the courts could not have proceeded unless an association with prospective patients created standing. If Article III is only satisfied by having an association with a present patient, standing could not have been found in these cases. Implicit in the courts' holdings in *Addiction Specialists* and *MX Group* is the principle that a relationship with patients, even those not yet ascertained, can be sufficient to generate standing.

An alternative holding would present somewhat of a Catch-22. Under the Defendant's understanding, a methadone clinic could only bring a claim under the ADA or RA if actual patients are identified. But how can a clinic treat actual patients—that is people with whom they "have" an actual relationship—before the clinic is allowed to open? If a town consistently denies an entity the opportunity to open a clinic, all patients, whether named in the complaint or not, must be purely prospective. Assume a plaintiff named several patients who signed up for services at the clinic prior to the issuance of a zoning decision. These patients could have never received any drug treatment services. The Defendant could argue quite convinc-

**17.** In fact, during trial in *MX Group,* witnesses testified about the prospective patients in purely hypothetical terms. *MX Group* at 331 (A witness for the plaintiff "testified that often a drug addiction affects a person's life in numerous ways, including loss of employment, spouses and children. She testified that the addiction affects a person's ability to hold a job, to engage in parenting, or to function socially.").

ingly that these patients are still prospective, due to the fact that they have not received any treatment, and have simply signed up on a list. Under this approach an entity will not be protected by the ADA or RA unless they provide treatment to patients in a clinic. But if the entity cannot open—perhaps due to discrimination by a municipality that violates the ADA or RA—and cannot treat any actual plaintiffs, the entity would never possess standing. That is, unless an association with prospective patients is found to satisfy Article III.

If the Court were to accept Defendant's line of reasoning, an entire class of recovering drug addicts would be excluded from the protections of the ADA and RA. This position stands in conflict with *Addiction Specialists* and *MX Group*, and more importantly, the text of the ADA and RA. While defendant emphasizes the use of the present-tense word *have* in the ADA,[18] this phrasing does not connote the requirement that the patient must in fact be a current patient. Rather, the statute requires that the entity must have an *association* with a disabled individual—the meaning of *association*, and how attenuated that relationship is with the third party entity, is the key to providing a proper construction to this statute.

At what point does a prospective relationship become relevant for purposes of constitutional standing? Because, the "broad language of the ADA and RA enforcement provisions evidences a Congressional intent to extend standing to the full limits of Article III," *Addiction Specialists*, at 407, in order to define the contours of an *association*, the Court must look to the outer bounds of all of our jurisdictional inquiries—Article III.

### c. Article III Standing is Satisfied When Association with Disabled Person is "Imminent"

While questions of associational standing and "injury in fact" are generally distinct inquiries, these two concepts have blurred, especially in the context of standing based on prospective patients under the ADA and RA. In order for an entity that seeks associational standing to suffer an injury under the ADA or RA, the entity must have an "association" with a disabled person. 28 C.F.R. § 35.130(g). While Third Circuit precedents have held that an entity itself can suffer an injury—that is experiencing discrimination in violation of the ADA or RA—an injury in the absence of an association still lacks standing. Whether an association is too attenuated to constitute standing is a question that tests the contours of Article III. In order to determine if the association remains within the confines of Article III, the court considers the Supreme Court's standing jurisprudence with a focus on "injury in fact"—more precisely, whether the injury is "actual *or* imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) citing (*Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (emphasis added)).

The Court's discussion of "injury in fact" in *Lujan v. Defenders of Wildlife* is instructive. *Lujan* involved a challenge to a rule promulgated interpreting the Endangered Species Act of 1973 (ESA), 87 Stat. 892, as amended, 16 U.S.C. § 1536, so as to render it only applicable to actions taken against endangered species within the United States or on the high seas, but not to actions taken against endangered species in foreign nations. *Lujan*, at 558–59,

---

**18.** 28 C.F.R. § 35.130(g) ("A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to *have* a relationship or association.") (emphasis added).

112 S.Ct. 2130. Respondent, an organization dedicated to wildlife conservation, filed suit, seeking a declaratory judgment that the new regulation was in error as to the geographical scope. Respondents claimed they were injured by this rule change, as the decrease in funding for endangered species living in foreign nations would "increase[ ] the rate of extinction of endangered and threatened species." *Lujan*, at 563, 112 S.Ct. 2130. On appeal, the Supreme Court considered whether respondents had standing to bring this suit.

Writing for the majority, Justice Scalia remarked that "the irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not "conjectural" or "hypothetical," Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [*Simon v. Eastern Kentucky Welfare Rights Organization* ] *Id.*, [426 U.S. 26] at 38, 43 [96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ]. *Lujan* at 560–561, 112 S.Ct. 2130 (citations omitted).

First, the Court considered whether the respondents suffered an injury in fact. The Court conceded that the "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, at 562–63, 112 S.Ct. 2130. "But the 'injury in fact' test requires more

than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, at 563, 112 S.Ct. 2130 citing *Sierra Club v. Morton*, 405 U.S., 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The Court required respondents to show that that "one or more of respondents' members would thereby be 'directly' affected apart from their 'special interest' in th[e] subject.' " *Lujan*, at 563, 112 S.Ct. 2130 citing *Sierra Club*, at 735, 739, 92 S.Ct. 1361.

While two of the Respondents—Joyce Kelly and Amy Skilbred—had previously visited the habitats of endangered species in Egypt and Sri Lanka, respectively, neither had actually seen any endangered species. *Lujan*, at 563–64, 112 S.Ct. 2130. Ms. Skilbred expressed an intent to return to Sri Lanka, "but confessed that she had no current plans." *Lujan*, at 564, 112 S.Ct. 2130. The Court found that these facts made no "showing how damage to the species will produce 'imminent' injury to Mses. Kelly and Skilbred." *Lujan*, at 564, 112 S.Ct. 2130. Justice Scalia wrote that a mere "intent" to return is "simply not enough" as " 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the *actual or imminent* injury that our cases require." *Lujan*, at 564, 112 S.Ct. 2130 (emphasis added). Because the harm was not "imminent," the Court found that the respondents did not suffer an injury in fact, and lacked standing. *Lujan*, at 565–67, 112 S.Ct. 2130.

While the statutory regimes are quite dissimilar, the underlying jurisdictional issues of *Lujan* and the instant case bear many similarities. In *Lujan*, plaintiffs claimed standing based on injuries to prospective endangered species. In the case *sub judice*, Plaintiff claims standing based on injures to prospective patients.[19] While

---

19. This injury to prospective patients is only

considered for purposes of Article III stand-

the Supreme Court in *Lujan* found that the harm was not "imminent," the facts in this case dictate a different result. In contrast with the conjectural associations of Mses. Kelly and Skilbred, RHJ took numerous, specific, unambiguous, and concrete steps towards opening up a methadone clinic—and fostering an association with patients.

RHJ "signed a ten-year lease for the site at 994 Beaver Drive on March 31, 2006, and soon after commenced renovations of the space to meet the standards of the Pennsylvania Department of Health." (Compl. ¶ 28). RHJ also took the requisite steps towards obtaining the appropriate licenses, as in "September 2006, representatives from the Division of Drugs and Alcohol of the Pennsylvania Department of Health and the DEA conducted an on-site inspection of RHJ's DuBois facility." (Compl. ¶ 30). Further, prior to the scheduled opening date, "RHJ incurred expenses relating to the hiring of staff, setting up utilities, and advertising, in addition to rent and renovations." (Compl. ¶ 29).

Defendant asserts that "from a practical standpoint," granting standing based on an "anticipated relationship" would permit "entities to recover § 1983 damages" if an entity is "created under the guise that it intends' to treat disabled individuals." (Def.'s Rep. p. 6.)[20] The Court is cognizant of the perils of granting standing based on prospective associations. This was the concern that animated Justice Scalia's framework in *Lujan*. If a plaintiff could gain standing under the ADA or RA by merely expressing an intent to open a methadone clinic, the courts would be flooded with premature associations, and in many cases, disingenuous litigants who

seek to take advantage of lax standing law. Justice Scalia's opinion, rejecting the "some day" approach to standing in *Lujan*, counsels against adhering to such a liberal standard. *Lujan*, at 564, 112 S.Ct. 2130.

In a concurring opinion in *Lujan*, Justice Kennedy remarked that "[w]hile it may seem trivial to require that Mses. Kelly and Skilbred acquire airline tickets to the project sites or announce a date certain upon which they will return ... this is not a case where it is reasonable to assume that the affiants will be using the sites on a regular basis." *Lujan*, at 579, 112 S.Ct. 2130 (Kennedy, J., concurring). Similarly, while "it may seem trivial" to require an organization to sign a lease or obtain the proper licenses to open a methadone clinic, in the absence of these steps, it is not reasonable to assume that a methadone clinic will in fact open. If a plaintiff takes such concrete steps, the injury should be considered imminent.

Third party standing is an essential tool for methadone clinics to enforce the rights of those with debilitating drug addictions. Drug addicts are the prototypical "discrete and insular minorities" who are the "outs" in society. *See McDonald v. Chicago*, 561 U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Stevens, J., dissenting) ("Conversely, we have long appreciated that more 'searching' judicial review may be justified when the rights of 'discrete and insular minorities'—groups that may face systematic barriers in the political system—are at stake.") citing *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), JOHN HART ELY, DEMOCRACY AND

---

ing. As discussed *infra*, Plaintiff itself was injured, and this provides for relief under the ADA and RA.

**20.** The Court notes that Defendant did not seek leave of court before filing this reply brief, as required by this Court's Practices and Procedures.

DISTRUST: A THEORY OF JUDICIAL REVIEW 77–78 (1980) (arguing that the courts should ensure that all groups receive sufficient representation and access to the political and legislative processes). Allowing treatment facilities, which undoubtedly have better legal resources to bring suit on behalf of patients—to give those with disabilities equal access to the courts and ensure that their disabilities are not used to discriminate against them by improperly restricting their access to drug addiction treatment—vindicates the protections that the ADA and RA champion. While the "broad language of the ADA and RA enforcement provisions evidences a Congressional intent to extend standing to the full limits of Article III," *Addiction Specialists*, at 407, the association with the patients must be imminent to fall within the ambit of Article III. Without this association, Plaintiff cannot recover for an injury under the ADA, even if the Plaintiff itself suffers the injury.

At this stage, the Court considers *Iqbal's* "plausibility" standard for construing a motion for a judgment on the pleadings. *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1959–1960, 173 L.Ed.2d 868 (2009). Following the Third Circuit's framework in *Fowler v. UPMC Shadyside*, the Court first separates the "factual and legal elements of [the] claim." 578 F.3d 203, 210 (3rd Cir.2009). Second, the Court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." " *Id.* at 210. The legal elements to this claim are quite distinct from the factual elements. The legal elements require that an association with disabled patients needs to be "imminent" in order to satisfy the requirements of Article III. The facts show that RHJ took several concrete steps in order to open up its clinic. Combining these factual elements with the legal elements yields a "plausible" claim. The complaint alleges that RHJ took certain concrete steps towards opening of the methadone clinic and establishing a relationship with patients. This association was imminent, and not hypothetical or conjectural. The Court finds that this claim is "plausible," and meets the requirements of *Iqbal.*

\*　　\*　　\*

Even though the association was imminent, the requirements of Article III have not yet been fully addressed, and the standing inquiry continues.

### d. Standing and Remedies

Standing is inextricably linked to the type of relief sought. In this case, RHJ requests both equitable relief and damages. For equitable relief, Plaintiff seeks a declaration that the Defendant's actions and inaction of failing to issue an occupancy permit violates the Constitution, the ADA, and the RA. Plaintiff also seeks an injunction enjoining Defendant from continuing to violate the Constitution, the ADA, and the RA. Finally, Plaintiff seeks an injunction forcing the City to issue Plaintiff a permit to operate a methadone treatment facility. Additionally, Plaintiff seeks "damages for the harm it experienced as a result of Defendant's discriminatory practices," as well as reasonable attorney fees and costs. Before addressing whether plaintiff has standing, the Court first separates the analysis based on the type of relief sought.

The Supreme Court held in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.* that "a plaintiff must demonstrate standing separately for each form of relief sought." 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). *See also City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive re-

lief). These considerations are especially relevant in the context of associational standing. In *Warth v. Seldin*, the Supreme Court commented that

> whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the *remedy, if granted, will inure to the benefit of those members of the association actually injured.* Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind. 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (emphasis added).

In short, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358, n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

In *Addiction Specialists*, the plaintiff sought a declaration that the defendant's denial of a permit to open a methadone clinic was unconstitutional, and requested an order requiring the defendant to grant the plaintiff a permit. *Addiction Specialists, Inc. v. The Township of Hamilton, Et Al.*, 1:04–CV–696 (W.D.Pa. Sept. 8, 2004). The plaintiff also sought an order enjoining the defendant from engaging in further discriminatory acts. *Id.* Additionally, the plaintiff sought $1,000,000 for lost profits under 42 U.S.C. § 1983. *Id.* Due to the pendency of concurrent state court proceedings, relying on *Younger* abstention, *Younger v. Harris*, 401 U.S.37, 91 S.Ct. 756, 27 L.Ed.2d 669 (1971), the District Court "abstain[ed] from deciding plaintiff's claims for equitable relief," and dismissed those claims. *Id.* Because the claims for damages "could be adequately raised and addressed in the state proceedings" the court dismissed those claims. *Id.* The District Court did not address the issue of standing.

On appeal, the Third Circuit found the District Court "abused its discretion by abstaining from exercising jurisdiction" over the constitutional and statutory rights claims. *Addiction Specialists*, 411 F.3d 399, 411 (3rd Cir.2005). While, the Court affirmed the "District Court's decision to abstain from [plaintiff's] claims for declaratory and injunctive relief," the Court reversed the lower court's opinion regarding damages, as *Younger* abstention was not proper for these claims. *Id.* at 414–415. In light of the posture of the case, the Third Circuit did not consider standing with respect to the equitable claims. Rather the Third Circuit's thorough and reasoned analysis on standing only focused on damages, and not the equitable claims. In the final paragraph of the standing section, the Court noted:

> In recognizing that ASI has standing to assert its claims under § 1983, the ADA, and the RA, we of course pass no judgment as to the merits of those claims. Moreover, we do not reach the issue of whether ASI's *lost profits would be the correct measure of damages* if and when this suit reaches the damages stage. We hold only that ASI has standing to seek *damages* on its own behalf. We therefore will not affirm the District Court's dismissal on standing grounds, and we will go forward to determine whether the District Court properly applied the *Younger* abstention analysis to ASI's claims.

*Addiction Specialists*, at 408 (emphasis added). This rationale applies to damages only, and makes no mention of the declaratory and injunctive relief requested. Subsequent discussions in the opinion regarding the equitable claims consider *Younger* abstention, and not Article III standing. The standing analysis in *Addiction* Spe-

cialists only seems to apply to the claims of damages. The Third Circuit has not directly addressed the issue of standing for claims of equitable relief based on prospective associations. Because "a plaintiff must demonstrate standing separately for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Court first considers standing for claims of equitable relief.

When equitable relief is awarded in cases of third party standing, the benefit will inure to the third party—in this case, the patients seeking methadone treatment—as well as to the entity—the methadone clinic—itself. For example, if the Court were to grant Plaintiff's requested equitable relief, and order the issuance of a permit, the patients of the methadone clinic, as well as the methadone clinic itself would benefit. The patients would benefit from their ability to receive services in the City of DuBois. RHJ would benefit from the ability to open up a new business and earn profits.

Such was the case in *MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002). In this case, the 6th Circuit considered whether a methadone clinic had standing to seek injunctive relief, and obtain a permit to open a clinic. *See Id.* at 327 ("The district court also entered an order and injunction, which provided that Defendants' ordinance, essentially banning Plaintiff's proposed methadone clinic from operating anywhere in the City of Covington, violated the ADA,"). While the remedy of damages was argued before the District Court, the issue was not resolved and was not presented on appeal. *See MX Group, Inc. v. City of Covington*, 106 F.Supp.2d 914, 920–21 (E.D.Ky.2000) ("plaintiff having reserved on the issue of damages").

The Sixth Circuit found that the methadone clinic had standing, as it was "an entity suing *primarily* on its own behalf, because of injury it suffered as a result of its association with individuals with disabilities." *MX Group*, at 335 (emphasis added). The right to sue, resulting from the injury suffered, is "*primarily* on [the entity's] own behalf." In other words, it is *not entirely* on the entity's own behalf. If the right is not entirely on the entity's own behalf, on whose behalf is the residuum? The residuum logically and textually can only derive from the "individuals with disabilities" with whom the entity had an "association." In this case, when seeking equitable relief, the standing to sue was in part due to the entity's injury, and in part due to the injury of the patients.

Unlike the opinion in *MX Group*, in *Addiction Specialists* the Third Circuit considered the plaintiff's request for both equitable relief and damages under § 1983. *Addiction Specialists*, at 407. While the Third Circuit favorably cited *MX Group*, which held that an entity has standing if it is "suing primarily on its own behalf," *MX Group*, at 335, the Court took what could be construed as a somewhat contradictory stance on this issue. The Court remarked that "ASI has standing to seek damages *on its own behalf under* § 1983.... As with its claims under the ADA and RA, ASI does not assert its § 1983 claims on behalf of individuals with disabilities, but rather brings these claims *primarily on its own behalf*" *Addiction Specialists*, at 407 (emphasis added). In the same paragraph the Court wrote that ASI had standing to seek damages "on its own behalf" and "primarily on its own behalf"—these are not the same thing. Elsewhere, the Third Circuit wrote "We hold only that ASI has standing to seek *damages on its own behalf*," *Addiction Specialists*, at 408 (emphasis added). In light of the entire opinion, it would seem that the Third Circuit endorsed the former

standard, and held that ASI had standing to seek damages solely "on its own behalf"—and not merely *primarily* on its own behalf.

This holding—when seeking equitable relief, the standing to sue is due solely to the entity's injury—is buttressed by the Third Circuit's rejection of the Seventh Circuit's holding in *Discovery House v. City of Indianapolis*, 319 F.3d 277 (7th Cir.2003). In *Discovery House*, a methadone clinic sued under the ADA and RA for damages, namely lost profits. *Id.* With respect to standing, the Seventh Circuit asked whether a methadone clinic could obtain "relief which perhaps indirectly will benefit its clients, but which primarily is designed to benefit its for-profit business." *Discovery House*, at 280. The recipient of the benefits in a suit for damages—just the entity—contrasts with the recipients of the benefits in a suit for equitable relief— the benefit will inure to the third party as well as to the entity. The Seventh Circuit chose to limit the scope of relief, noting that "the remedies we may find (other than those specifically set out in the statute) must, at the very least, be those which *directly* benefit the disabled." *Discovery House*, at 280 (emphasis added). In short, "the one thing that is clear, however, is that lost profits are not expressly provided," as "we see no way that either the ADA or the RA contemplates a recovery for lost profits for a business like that of the Discovery House." *Discovery House*, at 280–281. Because damages will only benefit the entity, and not the third party disabled patient, the Seventh Circuit did not permit this claim to proceed.

The opinion in *Discovery House* only considered damages as the clinic had received an award of "over a million dollars in damages for lost profits." *Discovery House*, at 280. In this case, the plaintiff did "not seek equitable relief," and only sought damages. *Discovery House*, at 280. The Seventh Circuit on appeal only considered whether the "ADA or the RA grant Discovery House standing to recover lost profits." *Discovery House*, at 280. The Third Circuit discussed the holding of *Discovery House*, in the context of its own analysis for standing for third party claims. While the Seventh Circuit rejected the plaintiff's claims for damages, the court favorably cited other precedents that "concern[ed] equitable relief to allow facilities to exist where they had been prohibited." *Id.* at 280. The Court noted that "for purposes of this case, we have no need to agree or disagree with those courts because the reasoning advanced in those cases does not address the problem posed by this case" where the plaintiff only seeks damages. *Id.* at 279–280. The analysis the Third Circuit rejected and "declined to follow," *Addiction Specialists*, at 407, only pertained to damages, and not to equitable relief. It seems that both the Third and Seventh Circuit recognize this bifurcation of standing based on the relief sought.

The reasoning in *Warth* endorses this distinction between standing for equitable claims and standing for damages. Chief Justice Burger recognized that in all of the cases the Supreme Court had considered, the requested remedy for third party standing was equitable, and not damages. *Warth*, at 515, 95 S.Ct. 2197 ("Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind [equitable]."). This makes sense in light of the fact that the equitable remedy "will inure to the benefit of those members of the association actually injured," and not purely to the benefit of the association itself. *Warth*, at 515, 95 S.Ct. 2197. In contrast, when the association is seeking damages, the benefit will only inure to the association itself.

These precedents suggest that courts impose different standing require-

ments based on the remedy sought. If the remedy sought is injunctive relief, then Article III requires that the injury should be suffered by the third parties as well as the entity itself. In this case, the benefit of the injunctive relief inures to the advantage of both of the injured parties—the patients *and* the entity. In contrast, if the remedy sought is damages, then Article III requires that the injury need only to be suffered by the entity, and not the patients. In this case, the advantage of the damages inures only to the injured party—the entity, and not the patients.

Assume a methadone clinic is denied a permit, cannot open, and suffers lost profits. The monetary damages could only possibly inure to the benefit of the methadone clinic itself. Other types of damages—future damages, incidental damages, punitive damages, attorney fees, and filing fees—will similarly only benefit the clinic. It could be argued that a clinic that receives compensatory damages will be better funded, and will be able to provide better services to the patients. However, the inquiry here focuses on the injury at the time of the denial of the permit, and not potential future benefits to the members. *See Discovery House,* at 280 (noting that damages "perhaps indirectly will benefit its clients, but . . . [they are] primarily . . . designed to benefit its for-profit business."). To paraphrase the American Humane Association's seal of approval, which is emblazoned during the end credits of all movies produced by the Screen Actors Guild, no patients were harmed during the attempted-opening of this methadone clinic. No injury, no benefit, no standing. The Plaintiff's complaint recognizes this distinction. While praying for damages, the complaint sought "damages for the harm *it* experienced as a result of Defendant's discriminatory practices," (Compl. ¶ 20.) (emphasis added). That is, the damages *it* experienced, and not any damages to patients.

Assume a methadone clinic is denied a permit, cannot open, and as a result of this denial, disabled patients are unable to receive methadone treatment and drug counseling. The clinic, on behalf of the patients, sues for equitable relief to obtain the permit and stop the discrimination. This is a different case from the facts of *Discovery House,* in that patients were in fact injured. Equitable relief—such as injunctions, declarations, specific performance, and estoppel—will benefit the patients, as well as the clinic. Unlike compensatory damages, if the court orders the issuance of a permit, the clinic will open, and the injury the patients suffered—discrimination and denial of treatment—will be remedied. Now, the patients can receive treatment at the clinic. Similarly, the injury the entity suffered—the inability to open a clinic—will also be remedied. With a permit, the clinic can open and operate. There is an injury to both parties, a benefit will inure to both parties, and therefore standing exists.

In a footnote in the reply brief, Plaintiff notes: "RHJ only asserts Counts II, III, V, and VI on its own behalf and does not assert any such counts on behalf of its prospective patients." (Pl.'s Rep., p. 5, n. 1.) Although RHJ does not assert any claims on behalf of named plaintiffs, RHJ still needs to rely on "prospective patients" with drug-addiction problems—the patients referred to in the complaint—in order to invoke the ADA or RA. To read this disclaimer any other way would amount to a waiver. Plaintiff would be effectively admitting that the ADA or RA is inapplicable, as RHJ by itself, without any associated disabled persons is unable to claim protection of these acts. The Court will not find a waiver here in the absence of clear language to that effect.

In essence, the discrimination against RHJ yielded two separate and cognizable

injuries. The first injury—the lost profits by the clinic due to the denial of the permit—was only suffered by the clinic itself, and dictates a remedy of damages. The second injury—the discrimination against the patients who were unable to receive treatment from the unopened clinic—was suffered in part by the patients, and in part by the clinic. This injury dictates an equitable remedy.

Accordingly, the analysis for standing in this case is bifurcated based on the type of remedy.

### e. Standing for Equitable Claims

For claims of equitable relief, the standing to sue is in part due to the entity's injury, and in part due to the injury of the third party. In this case, because no third parties were identified, Plaintiff needs to rely on prospective patients to generate standing for equitable claims. Relying on prospective patients—that is patients not yet ascertained—raises two issue. First, the ADA and RA contain nearly identical "carve-out" sections that provide that individuals "currently engaging in the illegal use of drugs" will not be considered "qualified" under the statute.[21] Without naming any patients, how could the City be expected to show whether these patients are engaging in the use of drugs, and thus exempted from the protections of the ADA and RA? Second, how can the Defendant know whether a prospective patient is an individual who possesses a "known disability?" If a prospective patient does not have a disability, the ADA and RA would not apply, and plaintiff's case would fail. Both of these issues would be essential elements of the City's defense.

### i. Statutory Carve–Out for Current Drug Use

■ Defendant notes that because no patients are named, the City would be unable to prove whether any of the patients are currently "engaging in the illegal use of drugs." Without this knowledge, Defendant cannot show if the patients would be protected by the ADA or RA, or would be exempted by the so-called "carve-out" provision. If an individual has used illegal drugs "recently enough so that continuing use is a real ongoing problem," he cannot claim the protection of the RA or ADA. *Brown v. Lucky Stores, Inc.,* 246 F.3d 1182, 1188 (9th Cir.2001).

This "carve-out" provision allows employers to discharge workers who engage in the illegal use of drugs, but prevents employers from discharging recovering addicts who are no longer using drugs. While this provision makes sense in the context of employment law—as most reported cases interpreting this provisions emerged from the workplace—it makes little sense as applied to methadone clinics, where the patients must be "engage[ed] in the illegal use of" opioids for at least one year in order to be admitted.[22] As the

---

**21.** *See* 42 U.S.C. § 12210(a) ("For purposes of this chapter, the term "individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use"); 29 U.S.C.A. § 705(20)(C)(i) ("For purposes of subchapter V of this chapter [29 U.S.C.A. § 790 *et seq.*], the term "individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use.").

**22.** 42 C.F.R. 8.12(e) ("An OTP [Opioid Treatment Program] shall maintain current procedures designed to ensure that patients are admitted to maintenance treatment by qualified personnel who have determined, using accepted medical criteria such as those listed in the Diagnostic and Statistical Manual for Mental Disorders (DSM–IV), that the person is *currently addicted to an opioid drug, and that the person became addicted at least 1 year before admission for treatment.* In addition, a program physician shall ensure that each pa-

Third Circuit noted in *New Directions,* this statutory carve-out is "an odd fit for" cases involving methadone clinics. *New Directions Treatment Services v. City of Reading,* 490 F.3d 293, 309 (3d Cir.2007).

The carve-out was intended to ensure that employers could discharge employees who were actually under the influence while at work and that employers could not discharge employees who were recovering addicts but were, at the time of any personnel action, drug free. *See id.* (quoting H.R. Rep. No. 101–596, at 62 (1990), U.S. Code Cong. & Admin. News 1990, pp. 565, 570–571 (Conf. Rep.)). This provision makes its first appearance at 42 U.S.C. § 12114(a). The carve out provision is repeated nearly verbatim—not verbatim as the Third Circuit suggested in *New Directions,* as there are several slight changes—in two portions of the ADA, Subchapter I and Subchapter IV. Subchapter I, which only pertains to employment matters, provides "[f]or purposes of this subchapter, a qualified individual with a disability shall not include any *employee or applicant* who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use," 42 U.S.C. § 12114 (emphasis added). Subchapter IV governs Miscellaneous Provisions, and applies to all cases governed by the ADA, and not just employment situations—including discrimination of patients attending a methadone clinic. This provision provides "[f]or purposes of this chapter, the term 'individual with a disability' does not include an *individual* who is currently engaging in the illegal use of drugs, when

the covered entity acts on the basis of such use." 42 U.S.C. § 12210 (emphasis added).

The language in Subchapter I refers to "employees or applicants" while the language in Subchapter IV uses the broader term of "individual." While the carve out's inclusion in Subchapter I makes sense, as this provision fits neatly into employment paradigms, its inclusion in Subchapter IV fits poorly into situations dealing with methadone clinics. The broader provision in Subchapter IV appears to consume the provision in Subchapter I. However, Congress made several important changes to distinguish the provision affecting employment and the provision affecting all of the ADA. The most significant distinction is section (c), which provides:

(c) Health and other services. Notwithstanding subsection (a) of this section and section 12211(b)(3) of this title, an individual shall not be denied health services, or services provided in connection with *drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services.* 42 U.S.C. 12210(c) (emphasis added).

■ The RA contains a nearly identical provision.[23] This clause, which is not included in Subchapter I, speaks directly to the matter before the Court. Even if an individual is "currently engaging in the illegal use of drugs," 42 U.S.C. 12210(a), if that person is receiving "services provided in connection with *drug rehabilitation,*" that person "shall not be denied health

tient voluntarily chooses maintenance treatment and that all relevant facts concerning the use of the opioid drug are clearly and adequately explained to the patient, and that each patient provides informed written consent to treatment.") (emphasis added).

**23.** 29 U.S.C. § 705(20)(C)(iii) ("Notwithstanding clause (i), for purposes of programs and

activities providing health services and services provided under subchapters I, II, and III of this chapter [29 U.S.C.A. §§ 720 *et seq.,* 760 *et seq.,* and 771 *et seq.*], an individual *shall not be excluded from the benefits of such programs or activities on the basis of his or her current illegal use of drugs if he or she is otherwise entitled to such services.*") (emphasis added).

services" on the "basis of current illegal drug use if the individual is otherwise entitled to such services." 42 U.S.C. § 12210(c). In other words, even assuming that RHJ's prospective patients were currently engaging in the illegal use of drugs, if they would be otherwise entitled to such drug counseling services, they would still be eligible for protection under the ADA or RA. It would seem that this provision was drafted specifically to remedy situations wherein individuals who currently engage in drug use seek the services of a methadone clinic.

This provision so understood recognizes the broad remedial purposes of the ADA and RA with respect to individuals recovering from a drug addiction. Invariably, the people who sign up for drug rehabilitation programs are either "currently engaging in the illegal use of drugs," 42 U.S.C. 12210(a), or have used illegal drugs "recently enough so that continuing use is a real ongoing problem." *Brown,* 246 F.3d at 1188. In fact, in order to be admitted to a methadone clinic under federal law, a person needs to have had an opioid addiction for at least one year.[24]

People who abstain from drug use have little need for methadone clinics. If the ADA and RA were interpreted to exempt from its protections individuals with drug addictions seeking help—the argument the Defendant makes—section (c) would be reduced to a nullity and mere surplusage. Some of the very people the acts seek to protect would not be protected. Whether any of the prospective patients were engaging in the use of illegal drugs is orthog-

onal to the question of whether the ADA or RA provides protection for them. Contrary to Defendant's assertions, this question has no bearing on the resolution of this case. In a sense, any patients that would receive treatment at the clinic could be considered *per se* exempted from the "carve out" provision.

### ii. "Back to the Future" of Disability

Reliance on an association with prospective patients for equitable claims raises another curious issue. The ADA provides "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the *known disability of an individual* with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g) (emphasis added). Our precedents, namely *MX Group* and *Addiction Specialists,* have found, or perhaps merely assumed, that prospective patients affiliated with an unopened methadone clinic would be disabled, without engaging in the fact-intensive, case-by-case analysis that Supreme Court disability jurisprudence requires. In this case, Plaintiff remarks that "[l]ogically, RHJ's prospective clientele would consist of individuals with opiate addictions." (Pl.'s Rep. p. 7). That is not necessarily the case in all situations.

■ Associating with conjectural patients is permissible for purposes of ascertaining standing, as Article III grants standing if the injury is "actual *or immi-*

---

**24.** 42 C.F.R. 8.12 ("An OTP [Opioid Treatment Program] shall maintain current procedures designed to ensure that patients are admitted to maintenance treatment by qualified personnel who have determined, using accepted medical criteria such as those listed in the Diagnostic and Statistical Manual for Mental Disorders (DSM–IV), that the person is currently addicted to an opioid drug *and*

*that the person became addicted at least 1 year before admission for treatment.* In addition, a program physician shall ensure that each patient voluntarily chooses maintenance treatment and that all relevant facts concerning the use of the opioid drug are clearly and adequately explained to the patient, and that each patient provides informed written consent to treatment.") (emphasis added).

*nent."* *Lujan,* at 560, 112 S.Ct. 2130 citing *Whitmore,* at 155, 110 S.Ct. 1717 (emphasis added). However, the ADA does not countenance assuming individuals are disabled without conducting an individualized, fact-intensive inquiry. Even if Plaintiff can establish the requisite association under Article III, that association must in fact be with an individual with a disability. A plaintiff cannot merely speculate that a prospective patient in the future may be disabled. Rather, the burden of proof is placed on the plaintiff to show that a disability exists. Section 12102 of the ADA provides three means by which a person can have a disability:

> The term "disability" means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102

Not one of these three subsections can possibly apply to prospective patients—that is, without encountering certain paradoxes generally reserved to science fiction.

### 1. Impairment That Substantially Limits Major Life Activity

To determine whether an individual is disabled under subsection A of Section 12102, the courts must determine whether an individual has a mental or physical impairment that substantially limits a major life activity. *Bragdon v. Abbott,* 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Drug abuse can constitute such impairment. *Id.* at 632–33, 118 S.Ct. 2196 (explaining that commentary accompanying the Department of Health, Education and Welfare's regulations interpreting the Rehabilitation Act includes drug addiction and alcoholism as a physical impairment); 28 C.F.R. § 35.104 ("The phrase physical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as . . . drug addiction."). However, merely identifying an impairment does not qualify one as a disabled individual. The plaintiff has the all-important burden of showing that this impairment "substantially limits one or more . . . major life activities." *Toyota Motor Manuf., Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002).

This inquiry must be made on a case-by-case basis. *Williams,* at 691–92. In *Williams,* the Supreme Court stated that it is not enough that someone presents evidence of a medical diagnosis of an impairment. *Id.* at 691. The ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Id.* at 691–92 (citation and internal quotation marks omitted). In light of the fact that "the Act defines 'disability' 'with respect to an individual,' . . . Congress intended the existence of a disability to be determined in such a *case-by-case manner."* *Id.* (citations omitted) (emphasis added).

In *Sutton v. United Air Lines, Inc.,* the Supreme Court held that "because the phrase 'substantially limits' is presented in the *present tense,* it must be read as requiring a person to be presently—not *potentially or hypothetically*—substantially limited in order to demonstrate disability." 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (emphasis added). In addition, "[t]he definition of disability also requires that disabilities be evaluated with respect to an individual." *Id.* at 483, 119 S.Ct. 2139, Accordingly, "whether a person has a disability under the ADA is an individualized inquiry," *Id.* at 483, 119 S.Ct. 2139, not a hypothetical inquiry.

In *Addiction Specialists*, the defendant "did not dispute that ASI's clients [were] disabled within the meaning of the ADA and RA." *Addiction Specialists*, at 406. However, the Defendant in this case does contest whether RHJ's prospective clients should receive protections under the ADA and RA. Considering the existence of a disability of future patients necessitates judging the physical or mental states of people in the future. A "case-by-case" investigation for facts that have not happened yet is not only impractical—it is impossible.

How can the Court possibly conduct a thorough, fact intensive discourse on the life activities, and how substantially they are impaired, for unidentified patients? Perhaps a prospective patient has an impairment, but the impairment does not substantially impact a major life activity. If a patient's impairment substantially affects a life activity, how can the court determine if that life activity is major? If an impairment impacts a major life activity, how can the court determine if the impairment is substantial? These are all questions without possible answers, questions that do not seem to have been addressed in our precedents, and questions that this Court is not prepared to answer. While Cosmologist Stephen Hawking concedes that time travel is theoretically possible,[25] the Court is not prepared to engage in jurisprudential speculation along the spacetime continuum.

### 2. Record of Impairment

To determine whether an individual is disabled under subsection B of Section 12102, the courts must determine whether an individual has a record of impairment. 42 U.S.C. § 12102. A record of an impairment signifies that an individual has "a

history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 28 C.F.R. § 35.104(3) (emphasis added). In order to combat the effects of erroneous but nevertheless prevalent perceptions about the handicapped, Congress expanded the definition of "handicapped individual" so as to preclude discrimination against "[a] person who has a record of, or is regarded as having, an impairment [but who] may at present have no actual incapacity at all." *School Board of Nassau County, Florida v. Arline*, 480 U.S. 273, 279, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) quoting (*Southeastern Community College v. Davis*, 442 U.S. 397, 405–406, n. 6, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)).

This inquiry must be precise, as a record that identifies a person as disabled for some other purpose which does not meet the ADA's definition of "disability"—such as receipt of Social Security disability benefits—will not necessarily establish the fact that the person has a record of being disabled under the ADA. 29 C.F.R. Part 1630, Appendix, § 1630.2(k). In *Arline*, the Supreme Court considered the plaintiff's detailed medical record in order to establish that her "hospitalization for tuberculosis in 1957 suffices to establish that she has a 'record of . . . impairment.'" *Arline*, at 281, 107 S.Ct. 1123.

How could a hypothetical patient have any *history*, let alone a record of impairment? Any record could only be conjectural. However, the Sixth Circuit seems to have accepted such paradoxical reasoning. In *MX Group*, the plaintiff showed that in order to be admitted into the methadone clinic—which had not yet opened or admitted any patients—a "person must

---

**25.** Scott Warren, *Stephen Hawking backs possibility for humans to travel millions of years into the future*, UK DAILY MAIL ONLINE (May 4, 2010, 8:49 AM), http://www.dailymail.co.uk/ sciencetech/article–1270531/Stephen Hawking–backs–possibility–time–travel– millions–years–future.html.

have a history of one year of opiate or narcotic addiction, including physical dependence" and show "proof of an addiction that has lasted for at least one year is required." *MX Group*, at 339.

The Court noted that "to succeed under this prong, Plaintiff must show that its *potential clients* have a record of 'an impairment that would substantially limit one or more of the individual's major life activities.'" *MX Group*, at 339 citing (*Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1229 (11th Cir.1999)) (emphasis added) (The citation to *Hilburn* is inapposite). *Hilburn* considered the case of Linda Hilburn, the named plaintiff-appellant, who sued under the ADA alleging she was discriminated against based on a record of impairment. *Id.* Hilburn is not a "potential" client of the future. While Hilburn can have a record, "potential patients" of the future cannot.

In *MX Group* the Court relied on the "record of" test to find that "potential clients" of a methadone clinic have a record of an impairment. *MX Group*, at 339. Judge Clay, seemingly aware of the tenuousness of this holding, remarked "that to overturn the district court's disposition in plaintiff's favor on the basis that an individualized inquiry of a client is needed would defy reason as plaintiff has presented evidence that it was altogether foreclosed from opening its clinic." *MX Group*, at 336. Additionally, the Court noted that "Plaintiff has submitted sufficient proof that its *potential* clients qualify as disabled under the ADA." *Id.* at 336. While the former rationale shows deference to the finding of the lower court, and recognizes the untenable position of the methadone clinic that was never allowed to open, the latter rationale simply cannot be reconciled with the fact that any proof submitted was purely conjectural.

The conflicting tenses used by the *MX Group* court shed some light on this issue: "Plaintiff nevertheless would prevail inasmuch as it has shown that its *potential clients* [—as in patients of the future (future tense)—] have [—at the current moment (present tense)—] a record of a disability." *MX Group*, at 340. The Sixth Circuit noted that proof for these matters "can come from letters from other treatment facilities or social service agencies or probation/parole officers, jails, courts, and/or parents." *Id.* Additionally, at trial, testimony indicated that "the types of individuals [who would be] admitted into Plaintiff's programs would include persons who are unable to work and 'function' because of their addiction, and who, according to documentary evidence, may not have been able to do so for at least a year." *Id.* at 339–340. The Court inserted "who would be" into the previous quotation because it stresses the fact that no patients had actually been admitted—largely because the clinic had never been allowed opened. Any proof, whether in the form of letters or testimony, would by necessity be purely conjectural and premature. Potential clients of the future cannot have a record of disability. To paraphrase a quote from the movie trilogy "Back to the Future," no one's future is ever written.[26]

---

**26.** *See* Back to the Future, IMDB, http://www.imdb.com/title/tt0088763/; Back to the Future Part 11, IMDB, http://www.imdb.com/title/tt0096874/; Back to the Future Part III, IMDB, http://www.imdb.com/title/tt0099088/. In the Back to the Future Trilogy, which began in the year 1985, the protagonist Marty McFly agreed to participate in a risky drag race, unable to back down after being called a "chicken". Tragically, Marty's car was hit by a Rolls Royce. With his hand injured, Marty could not play the guitar professionally, effectively halting his music career before it started. As the story goes, Marty's girlfriend Jennifer marries him because she felt sorry for him, Marty's future was forever changed—or was it? Marty's friend Dr. Emmet Brown, a mad scientist, constructed a time machine out

### 3. Regarded as Having an Impairment

For an individual to be regarded as having an impairment under subsection C, he must be "treated by a public entity" as having a substantial impairment of a major life activity, or have an impairment "only as a result of the attitudes of others toward such an impairment," or be "treated by a public entity" as if he had an impairment. 28 C.F.R. § 35.104(4). Following the Court's holding in *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139, the Supreme Court has held that "a person is 'regarded as' [being] disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).

To resolve this inquiry in *Murphy*, the Court conducted a detailed inquiry as to whether the plaintiff was in fact regarded as unable to obtain a Department of Transportation certification. Similar to the analysis in *Sutton*, the Court treated the question of whether a person is regarded as having a disability "as an individualized inquiry," *Sutton*, at 483, 119 S.Ct. 2139, and not a hypothetical inquiry. *Murphy*, at 523, 119 S.Ct. 2133 ("The evidence that petitioner is regarded as unable to meet the DOT regulations is not sufficient to create a genuine issue of material fact as to whether petitioner is regarded as unable to perform a class of jobs utilizing his skills.").

The objections that apply to subsections A and B apply equally to Subsection C. How can a person not yet ascertained be regarded as having any impairment? A person may be regarded or perceived as being impaired in the present moment. However, at the present moment, the entity has no association with that person. Thus, any perceptions of a disabled person would have to take place after the entity opens for business—namely, in the future.[27] With the three provisions of the ADA relegated to the realm of H.G. Wells and Dr. Emmet Brown, the Court turns to alternative approaches.

---

of a plutonium-powered DeLorean. In the second installment of the trilogy, Dr. Brown travels from the year 1985—prior to the injurious drag race—to the year 2015, along with Marty and Jennifer. While in 2015, Jennifer witnesses the Marty of 2015—whose hubris seems to have only grown since 1985—goaded into an illegal business transaction, after his colleague calls him a "chicken." Immediately following the completion of this deal, Marty's boss calls, tells him that he was monitoring the transaction, and notifies him that he is fired. Fax machines all over the house immediately receive faxes—I suppose e-mail is not popular in that version of the future—reading "YOU'RE FIRED!" Jennifer kept a copy of that fax. After a roaring time-traveling journey through the years 2015, 1955, and 1885, the time travelers return home to good old 1985. Marty, now a changed man refuses to participate in the drag race. At that moment, Jennifer's fax that read "YOU'RE FIRED!" was erased. Jennifer asks Dr. Brown about why the note was erased. Brown replies, "It means that your future hasn't been written yet. No one's has. Your future is whatever you make it." Unlike the drivers of the time-travelling DeLorean in Back to the Future, people of the future cannot have histories. When a court relies on the record of a patient from the future, they may as well be relying on the fax Jennifer brought back from 2015. If it is not adequate proof for science fiction movies, then it is certainly not adequate proof for the Court to consider.

**27.** To use an example from Back to the Future, even if Marty's boss in 2015 regarded Marty as having a disability in his hand, due to the notorious car accident, that perception would be irrelevant for a suit brought in 1985.

### iii. *Per Se* Disability

There are several fundamental problems inherent in relying on prospective patients to establish the requisite association for purposes of the ADA and RA. Any inquiry that is fact-intensive and individualized—the required test for all disability inquiries—is impossible for future patients. But what if an intensive and individualized test was unnecessary—that is, what if a patient had a disability *per se?* If a certain type of disability renders a person disabled *per se,* then the "case-by-case" examination would be unnecessary—a person would be disabled simply by the terms of the impairment. When dealing with future, prospective patients, a *per se* disability is the only type that withstands the exacting "case-by-case" scrutiny of the ADA and RA. If an entity can show that any patient who would be admitted to its methadone clinic is disabled *per se,* then that entity would automatically and by necessity have an association with an individual known to have a disability. While courts in other Circuits have held that drug addiction is not a *per se* disability,[28] the Third Circuit has not settled this matter.

*Per se* is defined as "[o]f, in, or by itself; standing alone, without reference to additional facts," or simply "as a matter of law."[29] In the context of torts, libel *per se* is a type of libel "that is actionable in itself, requiring no proof of special damages."[30] Relatedly, words that are actionable *per se* "are inherently libelous or slanderous."[31] In the context of antitrust, a

*per se* rule is a "judicial principle that a trade practice violates the Sherman Act simply if the practice is a restraint of trade, regardless of whether it actually harms anyone."[32] In short, the Latin *per se* connotes that in certain circumstances, a conclusion—which generally requires that specific premises be established—can be proven without establishing these premises. A disability *per se* connotes that in certain circumstances, an impairment—which usually must substantially impair a major life activity—can constitute a disability without the need to prove a substantial impairment of a major life activity. In such a case, an individualized inquiry—such as whether the impairment is substantial, or whether a major life activity is implicated—is not required. The notion of "per se" disabilities under the ADA and RA in the context of drug addiction is a developing doctrine that sheds some light on this issue.

### 1. Disability *Per Se* Precedents

The Supreme Court addressed the issue of disability *per se* in a single sentence, and provided no meaningful resolution to this evolving area of law. In *Bragdon v. Abbott,* the Supreme Court considered whether asymptomatic HIV can constitute a disability under the Americans with Disabilities Act. 524 U.S. 624, 628, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). The Court answered this question affirmatively, noting that "[r]espondent's HIV infection is a physical impairment which substantially limits a major life activity, as the ADA defines it." *Bragdon,* at 642, 118 S.Ct. 2196.[33] In light of the Court's holding,

---

**28.** *See Burch v. Coca–Cola Co.,* 119 F.3d 305, 316–17 (5th Cir.1997) (holding that alcoholism is not a *per se* disability under the ADA and evidence that alcoholics, in general, are impaired is inadequate to show the substantial limitation of one or more major life activities), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998).

**29.** Black's Law Dictionary 1257 (9th ed. 2009).

**30.** *Id.*

**31.** *Id.*

**32.** *Id.*

**33.** This holding comports, but does not concur with guidance issued by the EEOC and DOJ, which finds that HIV is a *per se* disability. *See* 28 C.F.R. pt. 36, app. A at 610 (noting that "symptomatic HIV disease is an impair-

Justice Kennedy did not see the "need ... [to] address the second question presented, *i.e.*, whether HIV infection is a per se disability under the ADA." *Id.* In her concurring opinion, however, Justice Ginsburg observed that "HIV infection is 'a physical ... impairment that substantially limits ... major life activities,' or is so perceived, including the afflicted individual's family relations, employment potential, and ability to care for herself...." *Bragdon,* 524 U.S. at 656, 118 S.Ct. 2196 (Ginsburg, J., concurring) (citations omitted). In the subsequent decision of *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), the Supreme Court noted that "some impairments may *invariably* cause a substantial limitation of a major life activity...." *Id.* at 566, 119 S.Ct. 2162 (citing *Bragdon* ).

In addition to HIV, several courts have considered whether alcoholism can constitute a disability *per se.* Many courts have found that alcoholism is not a disability *per se.*[34] The Third Circuit has mentioned in a dictum in an unpublished opinion that "al-

coholism is not a per se disability under our extant jurisprudence." *Szczesny v. General Elec. Co.,* 66 Fed.Appx. 388 (3d Cir.2003). District Courts in the Third Circuit have taken varying approaches towards disability *per se,* though no consensus has emerged. *Compare Hinnershitz v. Ortep of Pennsylvania, Inc.,* 1998 WL 962096 (E.D.Pa.1998) ("Though the ADA does not designate any impairment as a disability per se, alcoholism is a condition which can rise to the level of a disability") *with Maull v. Div. of State Police,* 141 F.Supp.2d 463 (D.Del.2001) (holding that "Plaintiff, in accordance with the express language of the ADA, [would need] to establish that his alcoholism substantially limits a major life activity"). In *Lopez v. Correctional Medical Services,* a recovering heroin addict alleged that his impairment constituted a disability *per se. Lopez v. Correctional Medical Services,* 2009 WL 1883915, 2009 U.S. Dist. LEXIS 55386 (D.N.J. June 30, 2009). The Court declined to rule on the disability *per se* issue, as the plaintiff had failed to allege any facts showing discrimination based on his addiction.[35]

---

ment that substantially limits a major life activity" and "asymptomatic HIV disease is an impairment that substantially limits a major life activity, either because of its actual effect on the individual with HIV disease or because the reactions of other people to individuals with HIV disease cause such individuals to be treated as though they are disabled"); 29 C.F.R. pt. 1630, app. 1630.2(j) at 350 (1998) (noting that "impairments ... such as HIV infection, are inherently substantially limiting").

34. *See Burch v. Coca–Cola Co.,* 119 F.3d 305, 316–17 (5th Cir.1997) (holding that alcoholism is not a *per se* disability under the ADA and evidence that alcoholics, in general, are impaired is inadequate to show the substantial limitation of one or more major life activities), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); see also *Wallin v. Minnesota Dep't of Corrections,* 153 F.3d 681, 686 n. 4 (8th Cir.1998) (citing *Burch* and requiring that a plaintiff show impairment of a major life activity), *cert. denied,* 526 U.S.

1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999); *Buckley v. Consolidated Edison Co. of New York, Inc.,* 127 F.3d 270, 274 (2d Cir. 1997) (citing *Burch* and requiring the plaintiff to demonstrate both "that he was actually addicted and that this addiction substantially limited one or more of his major life activities").

35. *Id.* The *Lopez* Court misstates a holding from *New Directions,* noting that "[i]n *New Directions Treatment Serv. v. City of Reading,* 490 F.3d 293, 308 (3d Cir.2006), the Third Circuit stated that 'recovering heroin addicts are presumptively 'qualified' persons under the ADA and Rehabilitation Act.' " The Third Circuit did not make this holding. Rather, the Third Circuit in *New Directions* wrote *"The parties do not dispute that* recovering heroin addicts are presumptively 'qualified' persons under the ADA and Rehabilitation Act." *New Directions,* at 308 (emphasis added). The Third Circuit merely noted that the parties did not contest this fact. This was not the holding of the Court.

The Federal Circuit in *Office of Senate Sergeant at Arms v. Office of Senate Fair Employment Practices,* a pre-*Bragdon* case, seems to have held that alcoholism is a disability *per se,* holding "it is well-established that alcoholism meets the definition of a disability." 95 F.3d 1102, 1105 (Fed.Cir.1996). That is, alcoholism is a disability by itself, and not simply an impairment that must substantially impact a major life activity in order to constitute a disability. But it is not clear if the Federal Circuit was referring to a disability, or a mere impairment.

*Miners v. Cargill Commc'ns,* could be read to support the proposition that alcoholism is a disability *per se,* but the Court's opinion is not clear. 113 F.3d 820 (8th Cir.1997). The Court found that the plaintiff had "made a *prima facie* case of discrimination under ADA." *Id.* at 823. With respect to proving a disability, the plaintiff "introduced evidence sufficient to establish that Cargill regarded her as being an alcoholic, thus making her disabled within the meaning of the ADA." *Id.* This would seem to indicate that merely introducing evidence of alcoholism constitutes a disability. Yet, in a footnote following this sentence, the Court remarked:

> The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities ... or being regarded as having such an impairment." 42 U.S.C. § 12102(2). Although alcoholism qualifies as a disability for the purposes of the ADA, *Crewe v. United States Office of Personnel Management,* 834 F.2d 140, 141 (8th Cir.1987), employers need not tolerate employees under the influence of alcohol in the workplace, 42 U.S.C. § 12114(c)(1),(2), and may hold an employee who is an alcoholic to the same standards of performance and behavior as non-alcoholics. 42 U.S.C. § 12114(c)(4). *Id.* at fn. 5.

Did the Eighth Circuit hold that "introduc[ing] evidence sufficient to establish" that the Plaintiff was an "alcoholic" is adequate to show that she was "disabled within the meaning of the ADA"? *Id.* at 823. Or did the sufficient evidence adduced show that the "physical or mental impairment ... substantially limit[ed] one or more major life activity." *Id.* at fn. 5, The District Court of Delaware noted that this case "suggested that alcoholism is *per se* a disability." *Maull v. Division of State Police,* 141 F.Supp.2d 463, 473 (D.Del. 2001).

None of these cases have invoked the talismanic incantation of "disability *per se.*" This omission is even more unfortunate in light of the fact that several courts seem to conflate the notion of an impairment with the notion of a disability. A disability is defined as an impairment that substantially impairs a major life activity. An impairment, if it substantially impairs a major life activity, becomes a disability. The two concepts are not equivalent. Merely identifying an impairment, such as alcoholism, is inadequate to show a disability. Yet many courts use the terms impairment and disability interchangeably, and this generates some confusion. When a court labels an impairment like alcoholism a disability, they seem to indicate that it is a disability *per se.* But closer readings of these opinions show that when these courts used the term disability with regard to these conditions they appear to mean impairment. *See e.g., Bryant v. Madigan,* 84 F.3d 246 (7th Cir.1996) ("alcoholism and other forms of addiction are disabilities within the meaning of the Act"). What constitutes a disability *per se* is far from clear.

In *Regional Economic Community Action Program, Inc. v. City of Middletown,* plaintiff sought a special-use permit for the construction of a halfway house for recovering alcoholics. 294 F.3d 35, 42 (2nd

Cir.2002). After several "contentious" hearings the City's planning board denied plaintiff RECAP's application, and plaintiff bought suit alleging that the City had violated the Fair Housing Act, the ADA, and the RA. *Id.* at 43. Defendants argued that RECAP's clients were not disabled within the meaning of the ADA and RA. *Id.* at 46. The District Court merely "assumed that the prospective residents of the halfway house me[t] the statutory definition of 'individual with a disability,'" and the Second Circuit "agreed."[36]

After noting that "[a]lcoholism, like drug addiction, is an 'impairment'" under the ADA and RA, the Court remarked that "mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation'" *Id.* at 46–47, *citing Burch v. Coca-Cola Co.,* 119 F.3d 305, 316–17 (5th Cir. 1997) (holding that alcoholism is not a *per se* disability under the ADA and evidence that alcoholics, in general, are impaired is inadequate to show the substantial limitation of one or more major life activities) *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998).

In order to show that plaintiff RECAP's clients were disabled—that is they have a major life activity that is substantially impaired by their alcoholism—the Court observed that New York State regulations limit admission to the Halfway House only to "persons who are unable to maintain abstinence and continued recovery in an available independent living situation." *Id.* at 47 citing N.Y. Comp. Codes R. & Regs. tit. 14, § 375.1. RECAP could only have admitted patients "who, *inter alia,* (1) had been 'diagnosed as suffering from alcohol dependence'; (2) had 'completed a course of alcoholism treatment' in an inpatient or outpatient setting; (3) were 'determined to be unable to abstain without continued care in a structured supportive setting'; and (4) were 'in need of alcohol-

ism services on an outpatient basis in addition to the supportive counseling available in the halfway house.'" *Id.* citing N.Y. Comp. Codes R. & Regs. tit. 14, § 375.8(c). Additionally, residents were not able to remain in the halfway house once they had "attained the skills and ability necessary to maintain abstinence and continue recovery in ... suitable independent living." *Id.* citing N.Y. Comp. Codes R. & Regs. tit. 14, § 375.1(g).

Based on these facts alone, and without considering an individualized inquiry, the court found that RECAP'S clients' "addictions substantially limit their ability to live independently and to live with their families"; that they are "entitled thereby to the protections of [the FHA, ADA, and RA]"; and that their "inability to live independently constitutes a substantial limitation on their ability to 'care for themselves.'" *Id.* at 47 citing *United States v. Borough of Audubon,* 797 F.Supp. 353, 359 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3d Cir. 1992).

The Second Circuit relied heavily on the fact that inhabitants in the halfway house would be unable to take care of themselves; "the inability to live independently without suffering a relapse—a *baseline prerequisite* for admittance to the RECAP facility—limits the major life activity of "caring for one's self."" *Id.* As a result of this "baseline prerequisite" which correlated with their inability to take care of themselves, the "residents of the *proposed halfway houses*" would suffer from an impairment that affects a major life activity. *Id.* (emphasis added). Considering whether the impairment was substantial, rather than temporary, under New York Law, a halfway house only admits patients that will be discharged "between three and nine months after admission." N.Y. Comp. Codes R. & Regs. tit. 14,

---

**36.** *Id.* at 46.

§ 375.8(g), thus making the impairment "long-term." *Regional Economic,* at 47.

The Court did not conduct the specialized inquiry required by *Sutton v. United Air Lines, Inc.* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (holding that "because the phrase 'substantially limits' is presented in the *present tense,* it must be read as requiring a person to be presently—not *potentially or hypothetically*—substantially limited in order to demonstrate disability."). The Second Circuit concluded that the "plaintiffs' clients would *have been deemed substantially limited* because they are unable to abstain from alcohol abuse without continued care; absent assistance, they cannot adequately care for themselves." *Id.* (emphasis added). In short, alcoholism was an impairment that substantially impaired the major life activity of taking care of oneself—the very definition of a disability under the ADA A. 42 U.S.C. § 12102. The court held that alcoholism, in and of itself, was a disability. In other words, alcoholism in this context was a disability *per se.*

In order to substantiate this disability *per se,* the Second Circuit relied on the regulated criteria governing the admission to a halfway house in order to discern whether a prospective patient is disabled. In other words, the Second Circuit held that any patient that could be admitted to a halfway house under New York law *must* be disabled under the definitions of the ADA. Although the Court seemed to rely on *Burch*—which rejected alcoholism as a *per se* disability—the Second Circuit's disability analysis takes the form of a *per se* inquiry, even if that term is not used. A disability *per se* by any other name would smell just as sweet.[37] A statutory ground-

---

ing to ascertain a disability *per se* is the key to the case *sub judice.*

## 2. Analysis

Eliminating the need for an individualized inquiry is not to be undertaken lightly. In fact, very few impairments could rise to the level of qualifying as a disability *per se.* In order to establish that a person suffers from a disability *per se,* there must be a "baseline prerequisite." *See Regional Economic Community Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 47 (2nd Cir.2002) ("the inability to live independently without suffering a relapse—a *baseline prerequisite* for admittance to the RECAP facility—limits the major life activity of "caring for one's self" ") (emphasis added). This baseline prerequisite establishes a person's impairment by virtue of its necessary impact on his existence.

The baseline prerequisite must show that several conditions exist—these elements largely track the Supreme Court's analysis from *Sutton,* 527 U.S. 471, 482, 119 S.Ct. 2139 (1999). First, the person must be afflicted by a physical or mental impairment covered by the ADA and RA. Second, by virtue of the nature of the impairment, a major life activity must be implicated. Third, to show that the impairment is substantial, it must be verifiable to a high degree of certainty that the impact on the major life activity must be significant. A person with an opioid addiction who meets the criteria for admission to a federally regulated methadone clinic is a strong candidate for suffering from a disability *per se*—the exact prospective patient under consideration in this case.

## 3. Impairment

Any person who seeks admission to a federally regulated methadone clinic must suffer from an opioid addiction for at least one year.[38] Under the ADA, a drug addic-

---

**37.** *See* WILLIAM SHAKESPEARE, ROMEO AND JULIET, act 2, sc. 1 ("What's in a name? that which we call a rose By any other name would smell as sweet").

**38.** *See supra* note 22 and accompanying text.

tion is a "physical or mental impairment" that may qualify an individual as a "handicapped person." *See* 28 C.F.R. § 41.31(b)(1)(i), *cited in Bragdon v. Abbott,* 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Thus, any patient afflicted by an opioid addiction suffers from an impairment covered by the ADA.

#### 4. Major Life Activity

Opioid addictions are a crippling impairment. By the very nature of this tragic condition, a person's existence is greatly affected. The addicts who are eligible for admission to a methadone clinic, as proscribed by the federal regulatory regime, must suffer from a state of inability wherein they are no longer able to help themselves. The Center for Substance Abuse Treatment (CSAT) of the Substance Abuse and Mental Health Services Administration (SAMHSA), within the U.S. Department of Health and Human Services published a manual providing guidance for accrediting opioid treatment programs. Guidelines for the Accreditation of Opioid Treatment Programs, available at http://www.dpt.samhsa.gov/pdf/OTPAccred-Guidelines-2007.pdf. Relying on the Diagnostic and Statistical Manual of Mental Disorders, the Guidelines find that "behavior supportive of a diagnosis of opioid dependence includes ... [s]uch regular patterns of compulsive drug use that daily activities are typically planned around obtaining and administering opioid." *Id.* at 10. Additionally "[b]ehavior indicative of opioid addiction includes ... [c]ontinuing use of the opiate despite known adverse consequences to self, family, or society." *Id.* at 11. RHJ is "fully certified by both the CSAT and DEA and licensed by the Commonwealth to operate a methadone clinic." (Compl. ¶ 9.) Any patient admitted to a clinic operated by RHJ would have to be treated under the auspices of these regulations.

Major life activities constitute tasks central to most people's daily lives. Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See Sulima v. Tobyhanna Army Depot,* 602 F.3d 177 (3rd Cir.2010) *citing* 29 C.F.R. § 1630.2(i). This list is merely illustrative and not exhaustive. *Bragdon,* 524 U.S. at 639, 118 S.Ct. 2196. The Third Circuit has also considered tasks such as thinking and interacting with others as examples of a major life activity. *See Andreoli v. Gates,* 482 F.3d 641, 651–52 (3d Cir.2007); *see also McAlindin v. County of San Diego,* 192 F.3d 1226, 1233 (9th Cir.1999) (holding that "interacting with others" constitutes a major life activity).

Opioid addicts are unable to maintain a normal lifestyle, and the dependency on drugs disrupts their lives. Such compulsive dependencies force a person to constantly think about feeding his addiction, often at any cost. An addict's schedule revolves around obtaining his next dose of drugs. If admitted to a methadone clinic, treatments are mandatory daily (and for addicts in the City of DuBois, this regimen includes a three-hour daily commute to the closest methadone treatment facility). This rigorous schedule will inhibit an addict's ability to maintain a job, interact with friends and family, and be a productive member of society—and perhaps more importantly, impact major life activities. If an opioid addiction disrupts a person's ability to live, work, and engage with members of society in order to secure his next fix, a patient admitted to a methadone clinic with an opioid addiction would almost certainly have a major life activity affected by his impairment.

#### 5. Substantial Impairment

While opioid addictions can impact major life activities, when an addict is eligible

for admission into a methadone clinic, the impairment may rise to the level of substantiality. Though the word "[s]ubstantially in the phrase '*substantially* limits' suggests considerable or ... a large degree [of limitation]," *Williams,* 534 U.S. at 197, 122 S.Ct. 681 (2002) (emphasis added), the Supreme Court has made clear that "[t]he Act addresses substantial limitations on major life activities, not *utter inabilities*" *Bragdon,* 524 U.S. at 641, 118 S.Ct. 2196 (emphasis added). See also *Fiscus v. Wal–Mart Stores, Inc.,* 385 F.3d 378 (3d Cir.2004) ("We also read the Supreme Court to hold that a substantial limitation of a major life activity does not mean impossibility or even great physical difficulty; rather, substantial limitation is weighed in a broad, practical sense."). When evaluating substantial limitation, the courts must consider a plaintiff's ability to compensate for a disability through mitigating measures, *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 565–67, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), but the essence of the inquiry regards comparing the *conditions, manner, or duration* under which the average person in the general population can perform the major life activity at issue with those under which an impaired plaintiff must perform. *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 307 (3d Cir.1999) (emphasis added). The EEOC guidelines counsel that the following factors should be considered in determining whether an individual is substantially limited:

(i) The *nature and severity* of the impairment;

(ii) The *duration or expected duration* of the impairment; and

(iii) The *permanent or long term impact,* or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2) (emphasis added).

In many respects, the baseline prerequisite for opioid addicts gaining admission to a methadone clinic demands satisfaction of these requirements. First, the "nature and severity" of opioid addictions are quite significant. The "behavior supportive of a diagnosis of opioid dependence includes ... [s]uch regular patterns of compulsive drug use that daily activities are typically planned around obtaining and administering opioid." Guidelines for the Accreditation of Opioid Treatment Programs, available at http://www.dpt.samhsa.gov/pdf/OTPAccredGuidelines–2007.pdf at 10. Second, in order to qualify for admission to a methadone clinic, federal regulations require an impairment of at least one year.[39] Second, this duration of impairment is quite long, and in many cases, a patient requires methadone treatment indefinitely in order to stay clean from opiates. A study of 105 patients who left methadone treatment showed that 82.1% returned to intravenous drug use within ten to twelve months without treatment. JOHN C. BALL & ALAN ROSS, THE EFFECTIVENESS OF METHADONE MAINTENANCE TREATMENT 182–85 (1991), Third, the long term impact of this impairment, in the absence of methadone treatment, is often permanent. *Id.* In light of these facts, life activities impaired by an opioid addiction would almost certainly be substantial.

The Court need not find that an opioid addiction must be a disability *per se.* The "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler,* at 210–211. At this stage of the litigation, in light of the lengthy analysis *supra,* and considering the standard of review for a motion for a judgment on the pleadings, the Court finds that an opioid addiction constituting a disability *per se* is "plausible." *Ashcroft v.*

---

**39.** *See supra* note 22 and accompanying text.

*Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1959–1960, 173 L.Ed.2d 868 (2009).

\* \* \*

Based on the pleadings, because Plaintiff has shown that any patient who would be admitted to its methadone clinic would by necessity have an impairment that substantially impairs a major life activity, RHJ automatically has an association with an individual known to have a disability. Thus, standing for equitable relief would be proper.

### f. Standing for Damage Claims

In light of the standing analysis discussed *supra,* the resolution of the standing inquiry for damages is relatively straightforward, and easily satisfies the *Iqbal* requirements. *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1959–1960, 173 L.Ed.2d 868 (2009). This injury—the lost profits by the clinic due to the denial of the permit—was only suffered by the clinic itself, and dictates a remedy of damages. Plaintiff does not need to rely on any injuries to third parties. While praying for damages, the complaint sought "damages for the harm *it* experienced as a result of Defendant's discriminatory practices," Complaint. p. 19 (emphasis added). That is, the damages *it* experienced, and not any damages suffered by patients. Because Plaintiff's association with patients afflicted with opioid addicts is "imminent," Article III is satisfied, and the ADA and RA require *no further of proof.* The injury suffered here creates standing for the claims of damages.

### II. Res Judicata

 Defendant claims that Plaintiff is barred by the doctrine of res judicata from asserting Counts I, II, and III. Defendant bases this assertion on the consent decree the parties entered into on December 7, 2006. The City claims that RHJ "stood silently before the Pennsylvania Court of Common Pleas and affirmatively chose not to challenge the constitutionality of § 621." The City also claims that RHJ "accepted the validity of ... § 621 and stipulated from its applicability." This is a mischaracterization of the nature of the stipulation and consent decree. In the decree, RHJ merely acknowledged that the "Beaver Meadow Walkway is a public park within the meaning of Section 621 ... and as a result, that the methadone clinic opened by [RHJ] ... is in violation of the terms of Section 621 because the site at 994 Beaver Drive is within 500 feet of the aforementioned park and RHJ ... did fail to obtain either an occupancy permit or certificate of use from the City of DuBois." (Doc. No 38–2.) RHJ only conceded that its facility was near a public park, and that it was in violation of § 621 for failing to obtain the requisite permits. The Court's order established a temporary arrangement in order for RHJ to seek the necessary permits. RHJ never actually contested the validity of § 621.

The facts in this case are quite similar to those in *Sullivan v. City of Pittsburgh,* 811 F.2d 171 (3rd Cir.1987). In *Sullivan,* the City of Pittsburgh denied use permits for alcoholic treatment facilities, and recovering alcoholics sought declaratory and injunctive relief. *Id.* The parties entered into a consent decree in the Allegheny County Court of Common Pleas to cease operation of the alcohol treatment facility, but did not litigate the constitutionality of the City's decisions. *Id.* at 180. After the resolution of the matter in state court, the treatment center brought suit in the Western District of Pennsylvania, alleging violation of the Constitution and federal statutes. *Id.* The City of Pittsburgh appealed the District Court's order that the use permit shall issue, arguing that the District Court failed to accord full faith and credit to the judgment of the Court of Common Pleas. *Id.* at 180–81. On appeal,

the Third Circuit held that in consideration of the principles of res judicata, "[i]n Pennsylvania, a consent decree is a judgment only as to matters actually litigated and cannot preclude claims which were not raised before and resolved by the approving court." *Id.* at 181 citing *Keystone Bldg. Corp. v. Lincoln Sav. and Loan Ass'n*, 468 Pa. 85, 360 A.2d 191 (1976). Because the constitutional and statutory claims were never raised before the Court of Common Pleas, the alcohol treatment center was "not afforded the full and fair opportunity to litigate those claims, which is a prerequisite for preclusive effect under Pennsylvania law." *Id.* at 181 citing *Safeguard Mut. Ins. Co. v. Williams*, 463 Pa. 567, 345 A.2d 664 (1975). Thus, it was appropriate for the parties to litigate this issue, and res judicata was not a bar.

*Sullivan* would seem to control the instant matter. In both cases, the consent decree precluded the opportunity for the parties to have a "full and fair opportunity to litigate those claims" before the state court. *Id.* at 181. Accordingly, the consent decree issued by the Court of Common Pleas has no preclusive effect under Pennsylvania laws to matters not litigated, and the doctrine of res judicata does not apply to bar claims I, II, and III.

### III. Waiver & Estoppel

■ Defendant also claims that Plaintiff should be estopped from raising Counts I, II, and III because it previously waived these issues by failing to contest the constitutionality of § 621 before the Court of Common Pleas. This argument is not supported by the consensual agreements the parties entered into. On December 7, 2006, RHJ and the City mutually agreed that the state court should issue an injunction, and stipulated that RHJ was in violation of § 621 because it attempted to place a methadone clinic within 500 feet of a public park. That was the extent of the stipulation. In fact, the stipulation

expressly noted that RHJ did not waive any of its claims regarding § 621, stating that RHJ's "defenses thereto are not waived by the issuance of this permanent injunction by consent of the parties." This stipulation is dispositive to this issue. The defenses were not waived.

Furthermore, in light of this stipulation, RHJ was not afforded a full and fair opportunity to assert its constitutional and statutory rights before the Court of Common Pleas. Where "[th]e conduct of the parties and the court, and the language of the [consent] decree itself, indicates that they did not intend that decree to act as an adjudication of" the underlying statutory and constitutional issues, the "issue was not addressed and was reserved for future determination." *See Keystone Bldg. Corp. v. Lincoln Sav. and Loan Ass'n*, 468 Pa. 85, 360 A.2d 191, 195 (1976). In light of this stipulation, the Court will not exercise the broad equitable remedy of estoppel to find that Plaintiff waived the right to contest these issues.

### IV. Immunity

Defendant claims that since its actions were authorized by a duly enacted state law, and following a Court's order, it is immune from damages for Counts I, II, and III under 42 U.S.C. § 1983, the ADA, and the RA respectively. For three decades, the Supreme Court has held that municipalities do not have immunity for suits stemming from 42 U.S.C. § 1983. *See Owen v. City of Independence, Missouri*, 445 U.S. 622, 657, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ("municipalities have no immunity from damages liability flowing from their constitutional violations"). The ADA specifically protects disabled persons from discrimination by a "public entity," 42 U.S.C. § 12132, which would include the City of DuBois. *See New Directions Treatment Services v. City of*

*Reading,* 490 F.3d 293, 301 n. 7 (2007). Similarly, the RA protects disabled persons from discrimination by "any program or activity receiving Federal financial assistance," 29 U.S.C. § 794, which would include the City of DuBois.[40] Congress specifically created causes of action against cities like DuBois, so immunity would not attach for suits under the ADA or RA.

Defendant concedes that "while general immunities may not apply to municipalities in a typical civil rights case, this case is vastly different." Defendant argues that the City was simply enforcing a state law—a valid law at the time of the enforcement. Specifically, the city merely "applied [§ 621] only after a state court ordered that § 621 applied to RHJ's permit application." The Defendant argues that when "the local government acted at the direction of its sovereign, the State [*sic*] of Pennsylvania," and the City "played no role in the development or promulgation of the state statute," this Court "must extend immunity to the City for those claims that arise from actions the City took pursuant to the direction of the state." The Defendant dubs Plaintiff's suit as amounting to "shooting the messenger." Simply put, DuBois is not liable for enforcing an unconstitutional law from the Commonwealth of Pennsylvania.

 Though the notion of "shooting the messenger" dates back to Sophocles[41] and Shakespeare,[42] it finds no refuge in our jurisprudence of municipal liability. Defendant provides no citations to substantiate the "shoot the messenger" theory of liability, other than several cases that

deal with immunity for individuals, rather than immunity for a municipality. These precedents are inapposite. Beyond the lack of support, the implications of this theory are troubling. The Defendant seems to assert that it is the sovereign state, and not the municipality, that should be held liable for enacting unconstitutional laws which are applied by the municipality. This cannot be correct. According to the Supreme Court's interpretation of the 11th Amendment, a state as sovereign cannot be sued in federal court by a citizen. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Citizens can only sue state officials under the *Ex parte Young* fiction for injunctive relief if the state official was prosecuting the citizen for violation of a state law. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

 *Ex parte Young* would not apply in this case, as the actor seeking to enforce the state law was the City of DuBois, not an official of the Commonwealth. A suit could not proceed against any state official under *Ex parte Young.* According to the Defendant's theory, a suit could not lie against the City, because it was simply enforcing a state law. If the Court were to adopt the Defendant's theory, Plaintiff would be unable to sue the municipality, and would be unable to sue the state— there would be a clear violation of rights, without a remedy. This inappropriate and unacceptable conclusion would stand in the face of the bedrock principles upon which our Republic was founded. *See Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60

---

**40.** *See e.g.,* TRACK THE MONEY, http://www.recovery.gov (last visited September 24, 2010) (noting that City of DuBois received numerous grants and loans from the Federal Government as a result of the American Recovery and Reinvestment Act of 2009, Public Law 111–5).

**41.** SOPHOCLES, SOPHOCLES, VOLUME II. ANTIGONE. THE WOMEN OF TRACHIS. PHILOCTETES OEDIPUS AT CO-

LONUS (Hugh Lloyd–Jones trans., Loeb Classical Library 1994) (442 B.C.) ("No one loves the messenger who brings bad news.").

**42.** WILLIAM SHAKESPEARE, ANTHONY AND CLEOPATRA, act 1, sc. 2. ("The nature of bad news infects the teller.").

(1803) (Marshall, C.J.) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.").

This holding also conflicts with the responsibility of government officials to comport their actions with our Constitution, Indeed, our Constitution requires that all "Members of the several State Legislatures" and executive officers "of the Several states, shall be bound by Oath or Affirmation, to support this Constitution." U.S. Const. art. VI. *See also Socialist Workers Party v. Martin,* 345 F.Supp. 1132, 1134 (S.D.Tex.1972) (finding that Article VI of the Constitution provides for affirmation of support of the Constitution from candidates for municipal offices). As the Supreme Court stated, "a decisionmaker would be derelict in his duties if, at some point, he did not consider whether his decision comports with constitutional mandates." *Owen v. City of Independence,* 445 U.S. 622, 656, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Municipalities cannot shirk their responsibility to follow this oath, and do not receive immunity for blindly following laws passed by a state. *See Owen,* at 651–52, 100 S.Ct. 1398 ("The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights."). Defendant is not immune from liability under Counts I, II, and III.

## V. Federalism

Defendant argues that this Court cannot "consistent with precepts of federalism, enter the sphere of local governance and order the City to grant RHJ" a permit, as this would "impermissibly interfere in the local governance of the City." Then–Justice Rehnquist wrote in *Rizzo v. Goode* in 1976, long before the so-called "Federalism Revolution" of the Rehnquist Court, that "where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments" the "principles of federalism which play such an important part" must be considered. 423 U.S. 362, 380, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In these situations, there are "delicate issues of federal-state relationships." *Id.* citing *Mayor v. Educational Equality League,* 415 U.S. 605, 615, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (Powell, J.).

This Court is not prepared to sit as a "zoning court of appeals," *Chesterfield Development Corp. v. City of Chesterfield,* 963 F.2d 1102, 1104 (8th Cir.1992), and does not seek to "transform[ ] run-of-the-mill zoning cases into cases of constitutional right," *Village of Willowbrook v. Olech,* 528 U.S. 562, 566, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (Breyer, J., concurring). In this case, the Court will approach the issuance of any injunctions with the proper respect for principles of federalism, *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 n. 13, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) citing *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' "). However, this challenge is somewhat premature. The Court is not awarding injunctive relief at this stage. The Court is only considering the Motion for Judgment on the Pleadings. What relief, if any, is awarded at a later stage is not before the Court at this time.

## VI. Statute of Limitations

 Both parties agree that claims brought under 42 U.S.C. § 1983, § 504 of

the Rehabilitation Act, and Title II of the Americans with Disabilities Act, apply the forum state's statute of limitations for personal injury claims. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Disabled in Action of Pennsylvania v. Southeastern Pa. Transp.*, 539 F.3d 199, 208 (3d Cir.2008). Both parties agree that the Commonwealth of Pennsylvania applies a two-year statute of limitations to personal injury claims. 42 Pa. Const. Stat. § 5524. The complaint was filed on May 14, 2009. Both parties agree that Plaintiff can rely on any claims that accrued after May 14, 2007. Plaintiff asserts that "Plaintiff can only rely on events and transactions that took place on or after May 14, 2007." This is not correct, and misstates the operation of the statute of limitations. Plaintiff can only raise claims that accrued following May 14, 2007, but *is in no way barred from relying on evidence that came into existence prior to that date.*

Plaintiff relies on two primary events to establish its case. First, the City's denial of the zoning application on May 14, 2007, and second, the enactment of the new zoning ordinance on November 27, 2007. Both of these events occurred within the statute of limitations. Plaintiff does discuss certain facts in its pleadings, which occurred in the time period beginning in October of 2006 when the City attempted to enjoin the opening of the clinic. Plaintiff could not—and did not—assert a claim based events that occurred before May 14, 2007. Rather, Plaintiff simply relies on these events, including the actions of the City of DuBois in 2006 with respect to the enforcement of § 621, to establish the factual record. This is permissible, to the extent that Plaintiff is not attempting to litigate claims based on events that occurred before May 14, 2007. All of Plaintiff's claims are timely filed and not barred by the statute of limitations.

## VII. Ripeness

■ Defendant claims that RHJ's attempt to raise an as-applied challenge to the new ordinance is not ripe. The Third Circuit has held that in as-applied challenges "in cases involving land-use decisions, a property owner does not have a ripe constitutional claim until the zoning authorities have had an opportunity to arrive at a final, definitive position regarding how they will apply the regulations at issue to the particular land in question." *Sameric Corp. of DE v. City of Philadelphia*, 142 F.3d 582 (3d Cir.1998). *See also Acierno v. Mitchell*, 6 F.3d 970, 974–75 (3d Cir.1993); *Taylor Investment, Ltd. v. Upper Darby Twp.*, 983 F.2d 1285 (3d Cir. 1993). Under the "finality rule," a plaintiff property owner must prove that a "final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds." *Acierno*, 6 F.3d at 975. It is undisputed that Plaintiff has not applied for a permit or variance under the New Ordinance. Defendant claims that the failure to seek a final decision from the Council renders this challenge unripe.

■ However, Plaintiffs do not challenge the constitutionality of the New Ordinance under the 14th Amendment as-applied. Rather, they challenge it on its face. (Compl. ¶ 71.) ("A city zoning ordinance that bars the establishment or operation of drug treatment clinic in districts where other medical treatment clinics are permitted to operate is *discriminatory on its face* against persons with disabilities ...") (emphasis added). The finality rule does not apply "to facial attacks on a zoning ordinance, i.e., a claim that the mere enactment of a regulation either constitutes a taking without just compensation, or a substantive violation of due process or equal protection." *County Concrete*

*Corp. v. Town of Roxbury,* 442 F.3d 159, 164 (3rd Cir.2006). "A 'final decision' is not necessary in that context because 'when a landowner makes a facial challenge, he or she argues that any application of the regulation is unconstitutional; for an as-applied challenge, the landowner is only attacking the decision that applied the regulation to his or her property, not the regulation in general.'" *Id.* citing (*Eide v. Sarasota County,* 908 F.2d 716, 724 n. 14 (11th Cir.1990)). Notwithstanding the lack of a "final decision," this matter is ripe for adjudication because, as demonstrated *infra,* Plaintiff states a plausible claim that the mere enactment of this ordinance violates substantive due process and equal protection.

## VIII. Fourteenth Amendment Claims

Plaintiff brings claims alleging a violation of substantive due process and the equal protection clauses of the Fourteenth Amendment. All of these claims survive Defendant's Motions.

### a. Procedural Due Process

Defendant claims that RHJ cannot assert a procedural due process claim because it failed to rely on the Pennsylvania court system to review any alleged constitutional deprivation of rights stemming from the zoning dispute. Plaintiff replied that it "did not assert a procedural due process claim in the Complaint." Because Plaintiff expressly waived this issue, Defendant's challenge under procedural due process is moot.

### b. Substantive Due Process

Substantive due process "is an area of law 'famous for controversy, and not known for its simplicity.'" *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 598 (3d Cir.1995) (quoting *Schaper v. City of Huntsville,* 813 F.2d 709, 715 (5th Cir. 1987)). The "fabric of substantive due process, as woven by our courts, encom-

passes at least two very different threads" pertinent to this case. *Nicholas v. Pennsylvania State University,* 227 F.3d 133, 139 (2000) (3rd Cir. 2000) (Alito, J.). The first strand of substantive due process claims "applies when a plaintiff challenges the validity of a *legislative* act." *Id.* The second strand "protects against certain types of nonlegislative state" or executive acts. *Id.* As then-Judge Alito instructed "[i]t is crucial to keep in mind the distinction between legislative acts and non-legislative or executive acts." *Id.* at n. 1.

Non-legislative, or executive acts, are government actions, "such as employment decisions [which] typically apply to one person or to a limited number of persons." *Id.* at n. 1 citing (*Homar v. Gilbert,* 89 F.3d 1009, 1027 (3d Cir.1996) (Alito, J., concurring in part and dissenting in part)). *See also, McKinney v. Pate,* 20 F.3d 1550, 1557 n. 9 (11th Cir.1994) ("Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch. The most common examples are employment terminations.") (citations omitted). In contrast, legislative acts are defined as "laws and broad executive regulations, [which] apply to large segments of society." *Nicholas,* at n. 1. *See also, McKinney v. Pate,* 20 F.3d 1550, 1557 n. 9 (11th Cir.1994) ("Legislative acts, on the other hand, generally apply to a larger segment of-if not all of-society; laws and broad-ranging executive regulations are the most common examples.").

 This distinction is significant because it determines the appropriate standard for substantive due process challenges. As Judge Alito explained in *Nicholas v. Pennsylvania State Univ.,* "typically, a legislative act will withstand substantive due process challenge if the

government 'identifies the legitimate state interest that the legislature could rationally conclude was served by the statute.'" 227 F.3d 133, 139 (3d Cir.2000) (citation omitted). In contrast, nonlegislative state action violates substantive due process if it is "arbitrary, irrational, or tainted by improper motive," or if it is "so egregious that it 'shocks the conscience.'" *Id.* (citations omitted). *See also, United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 399–400 (2003) ("*executive action* violates substantive due process only when it shocks the conscience") (emphasis added).

■■■ The new ordinance as well as § 621 clearly appear to be legislative acts. Both were implemented under the authority of the Pennsylvania Municipal Planning Code, which provides "The governing body of each municipality, in accordance with the conditions and procedures set forth in this act, may enact, amend and repeal zoning ordinances to implement comprehensive plans and to accomplish any of the purposes of this act." 53 P.S. § 10601. Pennsylvania courts have construed this provision such that the governing body of each municipality "is acting in a legislative capacity when considering an amendment to land use ordinances" and "the consideration and adoption of zoning amendments is a purely legislative act." *Springwood Development Partners v. Board of Supervisors of North Cornwall Township,* 985 A.2d 298, 304 (Pa.Cmwlth.2009). Furthermore, Pennsylvania courts typically characterize the duties of zoning boards as "legislative acts"[43] or "legislative functions."[44] Using Judge Alito's definition of "legislative act," the relevant zoning statutes in this case are "broad executive regulations, [and] apply to large segments of society," rather than "apply[ing] to one person or to a limited number of persons." *Nicholas,* n. 1. Facially, the zoning ordinances applied to all methadone clinics, and not just RHJ.[45] Additionally, this case bears similarities to *Concrete Corp. v. Town of Roxbury,* where the Third Circuit found that a zoning ordinance should be treated as a legislative act. 442 F.3d 159, 169 (3rd Cir.2006). The Court finds that the statutes challenged in Counts I and IV are "legislative acts."

Because the statutes are legislative, and not executive acts, Plaintiff does not need to meet the "shocks the conscience test." *See County Concrete Corp. v. Town of Roxbury,* 442 F.3d 159, 169 (2006) ("But *United Artists* did not apply the 'shocks the conscience' standard to legislative action; rather, we clearly held in United Artists that 'executive action violates substantive due process only when it shocks the conscience.'") citing (*United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA.,* 316 F.3d 392, 400 (3d Cir.2003)). Defendant incorrectly asserts that Plaintiff needs to identify a property interest for a due process challenge. Plaintiff does not need to establish a "protected property interest to which the Fourteenth Amendment's due process protection applies' as

---

43. *See e.g., Ludwig v. Zoning Hearing Bd. of Earl Tp.,* 658 A.2d 836, 838 (Pa.Cmwlth.1995) ("Without question, the promulgation of a zoning ordinance is a *legislative act* ") (emphasis added).

44. *See e.g., Ethan–Michael, Inc. v. Board of Supervisors of Union Tp.,* 918 A.2d 203, 210 (Pa.Cmwlth.2007) (noting that the Court cannot become involved with challenges to the "designation of zoning boundaries" without "improperly assuming almost the entire *legislative function.*") (emphasis added); *In re Long Lane Acres Appeal,* 1991 WL 356111 *3 (Pa.Com.Pl.1991) ("Rezoning is a purely *legislative function* reserved to the governing body") (emphasis added).

45. However, as discussed *infra,* for purposes of the equal protection analysis it seems that Plaintiff may in fact have been singled out for different treatment.

this standard only applies in a 'non-legislative substantive due process claim.'" *Nicholas*, at 139–40 citing (*Woodwind Estates v. Gretkowski*, 205 F.3d 118, 123 (3rd Cir.2000)). For Plaintiff's "facial substantive due process challenge to the Ordinance to be successful, [it] must 'allege facts that would support a finding of arbitrary or irrational legislative action by the'" City of DuBois. *County Concrete Corp.* at 169, citing *Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1034 (3d Cir.1987).

In *County Concrete Corp.*, the Third Circuit found that the appellants alleged "facts that indicate irrationality and arbitrariness, and 'present a case involving actions aimed at [appellants] for reasons unrelated to land use planning.'" 442 F.3d at 170 citing *Pace*, at 1035. The "complaint charges appellees with attempting to impede appellants' sand and gravel extraction operations on one tract, and their attempts to expand to another tract, through false accusations, verbal disparagement and the imposition of illegal conditions and restrictions on their business in violation a 1993 agreement." *Id.* Following this alleged animus, the municipality "enacted the Ordinance, which rezoned appellants' land from Industrial to either Rural Residential or Open Space. While the land in question is of an industrial nature and has been zoned for industrial uses for close to fifty years, the new designations only permit single-family detached dwellings and a minimum lot size of three acres." *Id.* The Court concluded that "[t]here is nothing in the complaint that would indicate any possible motivation for the enactment of the Ordinance other than a desire to prevent appellants from continuing to operate and expand their extraction business." *Id.* This type of "animus is not a legitimate reason for enacting a zoning ordinance, *see Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir.1988),

and is unrelated to land use planning, *see Pace*, 808 F.2d at 1035." *Id.*

 The facts alleged in the complaint plausibly show that the actions of the City of DuBois were based on an animus toward Plaintiff, and the patients its clinic intended to serve, rather than concerns about land use planning. In this case, Plaintiff signed a lease at a site on March 31, 2006. Plaintiff claims that the property was zoned as a "Transitional District," which permitted a medical facility to open. In late September or early October of 2006, nearly six months after RHJ signed the lease, the plans to open the clinic became public. Almost immediately, Plaintiff claims they were subjected to a massive wave of negative press coverage. Plaintiff claims, and Defendant disputes, that the mayor of DuBois stated in a radio interview that RHJ would likely not receive approval from the city to open such a facility and compared having a methadone treatment center in the City to "other cities dumping their garbage in DuBois."

Following a City Council meeting on October 9, 2006, on October 19, 2006, the City Council notified Plaintiff that the location was too close to a recreational park—which was in fact a sidewalk—and could not open at that location. Notwithstanding this letter, Plaintiff opened the clinic as planned on October 25, 2006. Defendant filed for an injunction the very next day on Friday, October 27, 2006, arguing that Plaintiff was opening the clinic in violation of § 621. The Court granted the preliminary injunction on Wednesday, November 1, 2006. Plaintiff claims that the Court did not hear oral arguments from both sides before issuing the injunction. Defendant claims arguments were heard. After the parties stipulated that the sidewalk constituted a public park for purposes of § 621, the Court entered a permanent injunction.

On June 16, 2007, the Third Circuit ruled that § 621 violated the ADA and

RA. *New Directions Treatment Services v. City of Reading*, 490 F.3d 293 (3d Cir. 2007). Relying on this opinion, in November of 2007, RHJ filed a motion to dissolve the injunction. The City opposed RHJ's motion, despite the fact that the Third Circuit had recently held the law on which the injunction was based violated the ADA and RA. That month, RHJ discussed with the City of DuBois the possibility of filing a change of use application to locate the clinic in an alternative site. On November 22, 2007, the DuBois City Council proposed an ordinance that prohibited "methadone or drug treatment clinics or centers," and not other types of medical facilities, in the Transition District. RHJ had signed a lease for a property sited in the Transition District. The ordinance also permitted medical facilities "with the exception of methadone treatment facilities and other drug treatment facilities of any kind" in the "Commercial–Highway Zoning District." Methadone clinics could only be opened in an "0–1 Office District." Plaintiff claims that there are no suitable sites for a methadone treatment facility located within the "0–1 Office District." Defendant disputes this assertion, but this issue presents a significant issue of fact that is unclear based on the pleadings. The ordinance was passed on November 27, 2007, and Plaintiff was again prevented from opening the methadone clinic. On March 7, 2008, nearly nine months after *New Directions* was decided, the Court dissolved the injunction. RHJ terminated its lease in July of 2008.

These alleged facts—which are all-too-common in situations where a municipality uses zoning practices to prevent the opening of a methadone clinic it opposes[46]—suggest that the actions of the City of DuBois were based on an improper animus that was "unrelated to land use planning." *Pace*, 808 F.2d at 1035. "This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard." *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 296 (3rd Cir.2007) (Smith, J.). If the City of DuBois were to have merely enforced § 621, and subsequently agreed to dissolve the injunction following *New Directions*, the City could claim to be simply adhering to § 621. This was not the case. When RHJ moved to dissolve the injunction, which was premised on an invalid statute, the City actively opposed the motion. This fact suggests that DuBois wanted to prevent the clinic from opening, notwithstanding the validity of the law. With lightning speed after RHJ moved to dissolve the

---

**46.** *See e.g., A Helping Hand, LLC v. Baltimore County, MD,* 355 Fed.Appx. 773 (4th Cir. 2009) ("Despite significant opposition from the local community, the Clinic, a for-profit methadone clinic, opened at its current site.... At that time, in response to the public mood, the County enacted an ordinance restricting the location of all 'state-licensed medical clinics,' including the Clinic"); *MX Group, Inc. v. City of Covington,* 293 F.3d 326 (6th Cir.2002) ("After the zoning permit [for the methadone clinic] was issued, town residents expressed their displeasure regarding the proposed clinic at a City Commission meeting. The Board adopted [an amendment] ... that completely foreclosed Plaintiffs opportunity to locate [a methadone clinic any-where] in the city."); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 727–729 (9th Cir.1999) ("In 1998, Bay Area Addiction Research and Treatment, Inc ... tried to relocate their methadone clinic to the City of Antioch, California ... Antioch residents had learned of BAART's plans for the Sunset Lane site and began to express their concern that the methadone clinic would result in an increase in crime.... On June 9, 1998, the city council approved ... another urgency ordinance ... [that] amended the first ordinance so as to prohibit only methadone clinics from operating within 500 feet of any residential property.").

injunction, the City enacted a new ordinance that was much like § 621. The purpose of this statute, it would seem, was to single out methadone clinics from other medical facilities, and greatly restrict where they could be located. Taking all of these allegations, the Court finds that Plaintiff states a plausible claim for a substantive due process violations. While Plaintiff's claim "may be ultimately unsuccessful if the [City] is able to demonstrate a legitimate reason" for its actions, there is no basis for a dismissal on the pleadings. *See County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 170 (3rd Cir.2006).

### c. Equal Protection

Defendant claims that Plaintiff failed to state a claim for an equal protection violation. "Unlike a substantive due process challenge, where the question is whether it was irrational for a [municipality] to have passed a zoning law at all, in an equal protection challenge the question is whether 'the [City] has irrationally distinguished between similarly situated classes.'" *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 171 (3rd Cir.2006) quoting *Rogin v. Bensalem Twp.*, 616 F.2d 680, 689 (3d Cir.1980). Traditionally, the equal protection analysis was two-fold. First, the Court must inquire "whether the complaining party is similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone." *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 137 (3d Cir.2002). If "the entities are similarly situated, then the [City] must justify its different treat-

ment of the two," *id.*, by demonstrating that the ordinance is rationally related to a legitimate government purpose. *Rogin*, 616 F.2d at 688.

Following the Supreme Court's 2000 case of *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), litigants are presented with an alternative method to state a claim under the equal protection clause of the Fourteenth Amendment for land use and zoning challenges. In *Discovery House*, the 7th Circuit found that "a[n *Olech*] 'class of one' [claim] is viable under the Equal Protection Clause" for a methadone clinic to challenge the denial of a zoning permit. *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 282 (7th Cir.2003) citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

■ Under the class of one approach, a single plaintiff[47] can present himself (or itself in this case) as a class irrespective of innate characteristics. *Olech*, at 564, 120 S.Ct. 1073 ("Historically, equal protection suits required that the plaintiff define a class based on certain inherent conditions, such as race, nationality, or gender. Under the class of one approach, a single person can present himself as a class irrespective of these characteristics.") Now, classes can be broadly defined. After *Olech*, a circuit split emerged as to whether a plaintiff needs to show malice, in addition to the factors the Supreme Court identified, in order to establish a claim under *Olech*.[48] In the Third Circuit, no

---

**47.** Corporations are considered persons for purposes of the Fourteenth Amendment, and their "rights are protected by 42 U.S.C. § 1983." *See Safeguard Mut. Ins. Co. v. Miller*, 472 F.2d 732, 733 (3rd Cir.1973) citing *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

**48.** *Compare Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir.2000) (Posner, J.)

(requiring that a plaintiff show a "vindictive action" which requires proof of a "totally illegitimate animus") *with Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921–22 (8th Cir.2001) (malice not required element to state a claim under *Olech*). In the Third Circuit, malice is not a necessary element to state a claim under *Olech*. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3rd Cir.2006).

malice finding is required, and "under ... [*Olech* ], a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3rd Cir.2006).[49]

■ Considering *Olech*, Plaintiff states a plausible claim under the equal protection clause. Plaintiff's complaint states "DuBois applied a *different standard* to RHJ than *other medical facilities.*" (Compl. ¶ 42.) (emphasis added). The class, as stated, was RHJ as a medical facility. Under § 621, methadone clinics were not permitted within 500 feet of a park, while other similar medical facilities were allowed to operate in those areas. Under the new ordinance, methadone clinics were still treated differently, and were not allowed to open in zones where other similar medical facilities were allowed to open. Plaintiff alleges that the City intentionally treated RHJ's medical facility—a methadone clinic that treated recovering opioid addicts—differently from other similarly situated medical facilities. These alleged facts satisfy the first prong of *Hill*, 455 F.3d 225, 239 (3rd Cir.2006).

The second element of intent, *Hill*, at 239, shares much in common with the showing of animus, and is addressed *supra* in the discussion of substantive due process. The Court's finding that the facts alleged in the complaint plausibly show that the actions of the City of DuBois were based on an animus towards Plaintiff, and the patients its clinic intended to serve, is a sufficient allegation that the actions of the City were intentional.

The third element of *Hill*, asks whether "there was ... [a] rational basis for the difference in treatment." *Hill*, at 239. While traditional forms of rational basis review are quite deferential, in two landmark cases, the Supreme Court has articulated a heightened, more searching form of rational basis review, dubbed by some commentators as "rational basis with bite." *Maldonado v. Houstoun*, 157 F.3d 179, 185 n. 7 (3rd Cir.1998) citing Gayle Lynn Pettinga, *Rational Basis with Bite: Intermediate Scrutiny by Any Other Name*, 62 Ind. L. J. 779, 787–92 (1987).

In *City of Cleburne v. Cleburne Living Center*, the Court considered the city's denial of a special use permit for the operation of a home for mentally disabled patients. 473 U.S. 432, 435, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although this group of patients was not a suspect class, the *Cleburne* Court actively scrutinized the City's proffered reason for treating the home differently than other similarly situated institutions within the zoned area. *Id.* at 458, 105 S.Ct. 3249 (Marshall, J., concurring in part and dissenting in part). After engaging in a "searching inquiry" into the reasons why the City denied the permit—notwithstanding the fact that rational basis review applied—the Court found that the City lacked a rational basis, and its actions were based on "irrational

**49.** While the Supreme Court rejected the application of the class of one claim in public employment decisions, *see Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008), its vitality remains in zoning and land use planning challenges, as Chief Justice Roberts went to great lengths to distinguish the case where the government *acts as employer and employs a worker*, as opposed to where the government acts as a sovereign and creates zoning and land use planning rules. *See id.* at 2151 ("[o]ur traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as *employer as opposed to sovereign*, lead us to conclude that the class-of one theory of equal protection does not apply in the public employment context.") (emphasis added).

prejudice against the mentally retarded." *Id.* at 459–60, 105 S.Ct. 3249 (Marshall, J., concurring in part and dissenting in part).

In *Romer v. Evans*, the Court applied a similar form of heightened rational basis scrutiny. *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). In this case, Colorado passed an amendment to its constitution that prevented government action to protect gays and lesbians against discrimination. *Id.* at 635–636, 116 S.Ct. 1620. Despite the fact that sexual orientation is traditionally considered a non-suspect class,[50] the Court engaged in heightened scrutiny, observing that " '[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.' " *Id.* at 633, 116 S.Ct. 1620 quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37–38, 48 S.Ct. 423, 72 L.Ed. 770 (1928). Because the amendment focused solely on gays and lesbians, the Court discerned an "inevitable inference" that the law was motivated by an impermissible animus, and the amendment was struck for violating the equal protection clause. *Romer*, at 634, 116 S.Ct. 1620.

In *Cleburne* and *Romer*, when the government discriminated against "discrete and insular minorities," *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), those without access to the political process, JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 77–78 (1980), the Court employed a more thorough version of rational basis review that inquired into the government's motivation and animus. It is worthwhile to reflect on the alleged victims of the City's actions in this case—the prospective patients of the clinic that could never open. Accepting "all of the complaint's well-pleaded facts as true," *Fowler*, at 210, these patients are recovering opioid addicts who are attempting to get clean, and are unable to avail themselves of the proposed methadone clinic as a result of the City using zoning laws to treat methadone clinics differently than other medical facilities. RHJ alleges that the City, including the Mayor, was hostile and antagonistic to the clinic, and took numerous steps to prevent the clinic from opening. While the Court does not opine about the appropriate standard, the question remains whether they would qualify as "discrete and insular." Considering all of these facts, the Court finds that Plaintiff states a plausible claim for an equal protection violation.

## IX. More Definite Statement

Finally, Defendant filed a motion for a more definite statement under Fed. R. Civ, P. 12(e), alleging that "Counts I and IV are littered with conclusory allegations and conflated causes of action." The Court finds that the Plaintiff's claims under the Fourteenth Amendment were clearly separated into claims based on Due Process and Equal Protection. The Court also finds that Plaintiff distinguished between facial and as-applied challenges.

Judging by the length and specificity of this memorandum, it seems fairly obvious to the Court that the complaint was sufficiently definite. This claim fails.

And now, this 6th day of December, 2010, the Court **DENIES** Defendant's Motion for Judgment on the Pleadings and

**50.** *Contra Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 997 (N.D.Cal.2010) ("The trial record shows that strict scrutiny is the appropriate standard of review to apply to legislative classifications based on sexual orientation. All classifications based on sexual orientation appear suspect, as the evidence shows that California would rarely, if ever, have a reason to categorize individuals based on their sexual orientation.").